MARTIN M. AND RUTH ANN DITTMAR, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 45442. Filed January 31, 1955.

*Leon O. Lewis, Jr., Esq.,* and *John H. Dittmar, Esq.,* for the petitioners.

*Edward L. Compton, Jr., Esq.,* for the respondent.

790

OPINION.

BLACK, *Judge:* On each of their joint returns for the calendar years 1948, 1949, and 1950, petitioner and his wife deducted as partial bad debts sums representing advances made by petitioner to Lone Star, his wholly owned sawmill corporation. Those deductions, which totaled $50,760, were disallowed by respondent.

Petitioner now contends that the entire $50,760 should be allowed as a bad debt deduction in 1950 and that respondent erred in failing to so allow it. He concedes that $1,606.25 in lumber was delivered by Lone Star in 1950, thereby reducing the balance of the advances due him from Lone Star to $49,153.75, and that this repayment was not recorded on the books of his sole proprietorship (Dittmar). It is manifest that Dittmar should have credited Lone Star with this $1,606.25 in 1950 and that when that is done, petitioner's advances to Lone Star which remained unpaid when Lone Star was liquidated in 1950 were $49,153.75. We are convinced from the record that the $1,606.25 lumber shipment was in fact not recorded in Dittmar's purchases account but was reflected in 1950 closing inventory. To that extent petitioner's cost of goods sold for 1950 was understated and his net profit overstated. However, the proper remedy for that error is to increase purchases (and, correspondingly, cost of goods sold) for 1950 by $1,606.25 and we hold that such adjustment should be made. As for the matter of petitioner's advances to Lone Star, therefore, our only concern is with the actual final balance of those advances, which was $49,153.75.

The first question we must decide is whether petitioner's advances to Lone Star were loans or were capital contributions. Petitioner contends, and has the burden of proving, that the advances were loans and that he is entitled to a full deduction, as a business bad debt under section 23 (k) (1) of the Internal Revenue Code of 1939, of the unpaid balance thereof. Respondent, on the other hand, argues that the advances were capital contributions and that deduction for their worthlessness is limited by the provisions of sections 23 (g) and 117 of the 1939 Code.[1]

---

[1] SEC. 23. DEDUCTIONS FROM GROSS INCOME.

(g) CAPITAL LOSSES.—

(1) LIMITATION.—Losses from sales or exchanges of capital assets shall be allowed only to the extent provided in section 117.

(2) SECURITIES BECOMING WORTHLESS.—If any securities (as defined in paragraph (3) of this subsection) become worthless during the taxable year and are capital assets, the loss resulting therefrom shall, for the purposes of this chapter, be considered as a loss from the sale or exchange, on the last day of such taxable year, of capital assets.

(3) DEFINITION OF SECURITIES.—As used in this subsection the term "securities" means (A) shares of stock in a corporation, and (B) rights to subscribe for or to receive such shares.

SEC. 117. CAPITAL GAINS AND LOSSES.

(b) PERCENTAGE TAKEN INTO ACCOUNT.—In the case of a taxpayer, other than a corporation, only the following percentages of the gain or loss recognized upon the sale or

In *Sam Schnitzer*, 13 T. C. 43, affirmed per curiam (C. A. 9) 183 F. 2d 70, certiorari denied 340 U. S. 911, we said:

This question is one of fact. *Cohen* v. *Commissioner, supra* [(C. A. 2) 148 F. 2d 336]. And in deciding whether or not a debtor-creditor relation resulted from advances, the parties' true intent is relevant, *Fairbanks, Morse & Co.* v. *Harrison* (N. D. Ill.), 63 Fed. Supp. 495; *Edward Katzinger Co., supra* [44 B. T. A. 533, affd. (C. A. 7) 129 F. 2d 74]; *Daniel Gimbel*, 36 B. T. A. 539. Bookkeeping, form, and the parties' expressions of intent or character, the expectation of repayment, the relation of advances to stockholdings, and the adequacy of the corporate capital previously invested are among circumstances properly to be considered, for the parties' formal designations of the advances are not conclusive, *United States* v. *South Georgia Ry. Co., supra* [(C. A. 5) 107 F. 2d 3], but must yield to "facts which even indirectly may give rise to inferences contradicting" them. *Cohen* v. *Commissioner, supra.* * * * As the Supreme Court said, however, in *Talbot Mills [John Kelley Co.]* v. *Commissioner, supra* [326 U. S. 521]:

.. * * * There is no one characteristic * * * which can be said to be decisive in the determination of whether the obligations are risk investments in the corporations or debts. * * *

A careful consideration of the facts of record, in the light of the applicable authorities, leads us to conclude that the $49,153.75 balance of petitioner's advances represents capital contributions.

Petitioner testified that he knew the sawmill venture was speculative and hazardous. Yet despite that—and in the face of net losses by Lone Star in every year of its corporate existence save one, corresponding increases in Lone Star's deficit, and its apparent insolvency from and after the close of its 1945 fiscal year—petitioner continued to make advances without ever charging interest, receiving written evidence of Lone Star's indebtedness, setting a definite date of repayment, or taking any security. *Erard A. Matthiessen*, 16 T. C. 781, affd. (C. A. 2) 194 F. 2d 659. In fact, advances were made throughout and after the 1948 calendar year, by which time, petitioner testified, he realized Lone Star could not be operated at a profit. And, although the balance of advances decreased from a high of $135,168.80 on March 31, 1946, to the final balance of $49,153.75 at Lone Star's liquidation in 1950, the corporation's deficit was increasing during that same period and its insolvency was, consequently, becoming more acute. It is

---

exchange of a capital asset shall be taken into account in computing net capital gain, net capital loss, and net income:

    100 per centum if the capital asset has been held for not more than 6 months;
    50 per centum if the capital asset has been held for more than 6 months.

    *       *       *       *       *       *       *

(d) LIMITATION ON CAPITAL LOSSES.—

    *       *       *       *       *       *       *

    (2) OTHER TAXPAYERS.—In the case of a taxpayer, other than a corporation, losses from sales or exchanges of capital assets shall be allowed only to the extent of the gains from such sales or exchanges, plus the net income of the taxpayer of [or] $1,000, whichever is smaller. For purposes of this paragraph, net income shall be computed without regard to gains or losses from sales or exchanges of capital assets. If the tax is to be computed under Supplement T, "net income" as used in this paragraph shall be read as "adjusted gross income".

evident from the above, as well as from petitioner's testimony that the 627 advances he made to Lone Star throughout its corporate existence were dictated solely by Lone Star's needs, that a disinterested creditor certainly would not have continued to advance funds for a deficit operation such as Lone Star. *Erard A. Matthiessen, supra.* Further, the all-inclusive nature of the advances made by petitioner (i. e., for capital assets, working capital, and to enable Lone Star to meet specific obligations), plus the added fact that no effort was ever made to borrow money for Lone Star from other sources, indicate that the parties understood that petitioner was to underwrite all of the corporation's financial requirements. See *Erard A. Matthiessen, supra; Alfred R. Bachrach,* 18 T. C. 479.

The pattern followed upon Lone Star's liquidation during 1950 is also of pertinence to this issue. Following the sale of Lone Star's capital assets in February 1949, Lone Star was liquidated over a period of time ending in the 1950 calendar year. In that liquidation all of Lone Star's debts to outside creditors were satisfied in full.[2] No pro rata distribution of Lone Star's assets was made between the amounts due those outside creditors and petitioner's advances, as would customarily be the case were petitioner regarded as a bona fide general creditor, nor does it appear that petitioner took any action to enforce payment of at least his pro rata share. *Watson* v. *Commissioner,* (C. A. 2) 124 F. 2d 437, affirming 42 B. T. A. 52. From this we cannot avoid the inference that petitioner never did intend to enforce payment of the advances or assert the rights of a genuine creditor and that, in fact, his "state of mind * * * [with respect to the advances] was akin to that of the ordinary shareholder, who understands that his investment is subject to the risks of the venture and the prior claims of creditors." *Gooding Amusement Co.,* 23 T. C. 408. *Phil Kalech,* 23 T. C. 672, second point decided.

It is our conclusion that the record belies the formal characterization of petitioner's advances as loans (on the books of Lone Star and Dittmar), *Sam Schnitzer, supra; Gooding Amusement Co., supra; Phil Kalech, supra.* Further, the fact that Lone Star was formed for the purpose of providing petitioner's retail lumber business with a source of lumber supply does not, under the circumstances, serve to strengthen petitioner's contention. See *Harry Sackstein,* 14 T. C. 566. We hold, therefore, that the $49,153.75 balance of advances to Lone Star represented capital contributions, deduction for the worthlessness of which is governed and limited by the provisions of sections 23 (g) and 117 of the 1939 Code. Having held that the $49,153.75 represents a capital investment in Lone Star, it

---

[2] A liability of $62.83 listed as due "officers" was unsatisfied, but we deem that of little moment here since it was probably due to petitioner or a member of his family.

naturally follows that this $49,153.75 becomes an additional part of the cost of the stock which petitioner owned in Lone Star.

The final question for consideration is whether petitioner's loss was sustained in the 1950 calendar year, as petitioner maintains, or, as respondent contends, either prior to 1949 or in 1949 itself.

We think petitioner's contention that his loss was incurred in 1950 must be sustained. Paragraph 16 of the stipulation of facts reads: "The Lone Star Lumber Company was liquidated during 1950." It is, of course, unnecessary to cite authorities for the proposition that one cannot take a deduction merely because his capital investment has depreciated in value. Regulations 111, section 29.23 (e)–4, provides:

SEC. 29.23 (e)–4. SHRINKAGE IN VALUE OF STOCKS.—A person possessing stock of a corporation cannot deduct from gross income any amount claimed as a loss merely on account of shrinkage in value of such stock through fluctuation of the market or otherwise. The loss allowable in such cases is that actually suffered when the stock is disposed of. If stock of a corporation becomes worthless, its cost or other basis as determined and adjusted under section 113 and sections 29.113 (b) (1)–1 to 29.113 (b) (3)–2, inclusive, is deductible by the owner for the taxable year in which the stock became worthless, provided a satisfactory showing is made of its worthlessness. * * *

It is true, of course, that petitioner's investment in Lone Star had but little value at the close of the calendar year 1949. Lone Star sold its assets in 1949 and ceased operations. From then on it was in liquidation until that liquidation was complete in 1950. As detailed in our Findings of Fact, in 1950 petitioner received a distribution from Lone Star of $1,606.25 in lumber. That was his last distribution and there was no prospect that he would receive any more. It, therefore, seems clear that under the Treasury's own regulations and the decided cases petitioner's loss, because of the worthlessness of his investment in Lone Star, was incurred in 1950. It was then that the identifiable event which definitely fixed his loss occurred. See *875 Park Avenue Co.* v. *Commissioner*, 217 F. 2d 699, affirming T. C. Memorandum Opinion. In this case the Second Circuit said:

Where a deduction is sought for losses incurred due to stock becoming worthless, the taxpayer must show that it actually lost its value. It is not sufficient to show merely that its value shrank, though the shrinkage was extensive. If it had any recognizable value at all on the claimed date of loss there can be no deduction. *Miami Beach Bay Shore Co.* v. *Commissioner*, 5 Cir., 136 Fed. (2d) 408 * * *. Further, the taxpayer must show by some fixed and identifiable event or events, that the stock became worthless in the year for which the deduction is claimed. A subjective determination of worthlessness will not suffice. *Boesel* v. *Commissioner*, 2 Cir., 208 Fed. (2d) 817 * * *

We think that the above quotation from the Second Circuit's opinion correctly states the rule governing deductions for losses due to the worthlessness of stocks. Furthermore, we think petitioner has

met his burden of proof to show that his loss, because of the worthlessness of his stock in Lone Star, including his additional capital investment of $49,153.75, was incurred in 1950 and we so hold. The applicable provisions which govern the amount of the loss to be recognized are sections 23 (g) (2) and 117 of the 1939 Code, printed in footnote 1.

*Decision will be entered under Rule 50.*