*Decision will be entered for the respondent.*

J. A. MAURER, INC., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 56500. Filed September 26, 1958.

*Albert D. Jordan, Esq.*, and *David Stock, Esq.*, for the petitioner.
*A. Jesse Duke, Jr., Esq.*, for the respondent.

The Commissioner determined deficiencies in the income tax of petitioner, J. A. Maurer, Inc., for the taxable years 1948 and 1949 in the respective amounts of $164,378.50 and $34,520.07.

The deficiencies result from respondent's determination that a cancellation of $900,000 of petitioner's notes in 1948 for $400,000 by a majority shareholder in petitioner resulted in taxable income in the amount of $500,000, plus $1,996.97 in accrued and deducted interest on the notes which also was canceled. The deficiency for 1949 results from respondent's disallowance of a net operating loss deduction of $85,291.66 carried over by petitioner from 1948.

The issue presented for decision in this case is whether the cancellation of the petitioner corporation's notes by the shareholder for an amount less than the amount of the obligations gave rise to taxable income under section 22 (a) of the Internal Revenue Code of 1939 as interpreted by section 29.22 (a)–13 of Regulations 111 and, if so, the extent thereof.

### FINDINGS OF FACT.

Those facts stipulated and the exhibits attached thereto are made a part of our Findings of Fact by this reference.

Petitioner is a corporation incorporated under the laws of New York, doing business in that State and having its principal place of business during the taxable years in Long Island City, New York. The petitioner, hereinafter sometimes referred to as the corporation, filed consolidated corporate income tax returns for the calendar years 1948 and 1949 for itself and its subsidiary, Precision Film Laboratories, Inc., hereinafter sometimes referred to as Precision, with the collector of internal revenue for the first district of New York, at Brooklyn, New York.

Petitioner was incorporated on December 26, 1940, with an authorized capitalization of $25,000, consisting of 2,500 shares of capital stock having a par value of $10 per share. At that time and at all times thereafter relevant, the corporation was engaged in the business of developing and manufacturing for professional use 16-millimeter motion-picture cameras, projectors, and associated sound recording and coordinating equipment, as well as the production under subcontracts of various optical and motion-picture machinery and equipment. Precision was organized by petitioner on January 1, 1947. This wholly owned subsidiary continued a line of business which had previously been carried on as a division of the parent and its predecessor corporation, namely, 16-millimeter sound film developing and processing; and at all times relevant Precision was so engaged

and was recognized as one of the best (and also one of the most expensive) processing and developing concerns in the industry. All maintenance and repair work on its machinery and equipment was done by petitioner corporation, which also did its engineering work and took care of part of its accounting and bookkeeping.

J. A. Maurer, R. J. Reynolds, and another individual had been equal stockholders of a corporation engaged in a similar business. Reynolds, in addition to the purchase of stock of that corporation, had advanced moneys for its operation and received its notes in the amounts of the moneys thus advanced. In 1940 Reynolds decided to call these notes, liquidate this corporation, and continue the business through a new corporation, which was the petitioner herein.

Upon the formation of the petitioner corporation which was then located in New York City there were only 10 shares of $10 par capital stock subscribed; these were all held by Maurer, who paid $10 a share for them, or a total of $100. Maurer made contributions to the capital of the corporation of the assets of the predecessor defunct corporation which Maurer had purchased for $42,993 at a public sale, and cash in the amount of $17,007 (a total of $60,000), plus his interest in patents and patent applications, goodwill, inventories, and improvements previously owned by the prior defunct corporation. These assets and the cash contributed by Maurer to the corporation had been acquired by Maurer as the result of a loan made to him personally in substance by Reynolds, although the form of the transaction was that the Safe Deposit & Trust Company of Baltimore, Maryland, hereinafter sometimes referred to as Safe Deposit, advanced the $60,000 to Maurer upon the full guarantee of Reynolds. As security for the advance of $60,000 by Safe Deposit, a chattel mortgage covering the assets transferred to the corporation was executed by it in favor of Maurer and was then assigned by Maurer to the Safe Deposit & Trust Company. From July 24, 1941, until January 18, 1943, additional funds in the amount of $90,000 were furnished the corporation in the following manner: Safe Deposit loaned the $90,000 to Maurer against his promissory notes, which were guaranteed by Reynolds, and Maurer advanced the $90,000 to the corporation taking its notes in that amount secured by an open-end chattel mortgage of $100,000, which Maurer assigned to the Safe Deposit & Trust Company, together with petitioner corporation's reassignment of letters patent and patent applications. On April 14, 1942, petitioner corporation's notes to Maurer were renewed.

On or about January 18, 1943, Reynolds took over the loans by Safe Deposit to Maurer which then aggregated $110,000, and received a substitute demand note of Maurer for the amount of said loans in the amount of $110,000. At this same time the corporation was recapitalized; the par value of the common stock outstanding

and that unissued was increased to $100, and the issuance of voting preferred stock with a par of $100 was authorized. Maurer exchanged his 10 shares of old $10 par common for 1 share of new $100 par common. On July 22, 1943, Maurer received 600 additional shares of new common and 500 shares of the preferred class in consideration of the funds previously advanced to the corporation and, simultaneously, Reynolds exercised his rights with regard to an outstanding option and acquired 330 shares of common stock and 500 shares of preferred stock from Maurer in exchange for the partial extinguishment of the promissory note running from Maurer to Reynolds to the extent of $83,000. As a result of these transactions Reynolds owned 75.4 per cent of the voting stock of the corporation. This control continued at all times until Reynolds terminated all his interest in the corporation.

During the years of World War II the corporation was profitably engaged in the manufacture of equipment for the Government and moved its place of business from New York City to Long Island City. Loans by Reynolds, both directly and on his credit from Safe Deposit, during this period were fully secured by the assignment of the Government contracts and by the fall of 1945 were repaid except to the extent of $21,020. In late 1945 and early 1946 the corporation, under Maurer's direction, sought a workable program of postwar operations involving the development of an improved 16-millimeter motion-picture camera of a professional type, an improved sound recorder, and a film phonograph. The Government war contracts had terminated and the corporation's prewar products had largely been rendered obsolete by wartime developments. Financing for this program was asked of Reynolds. In October 1945 Maurer told Reynolds that financing a development of an improved 16-millimeter motion-picture camera and assorted products would require at least $250,000 and probably $400,000 on a long-term basis. At that time the corporation's available working capital was in the approximate sum of $15,000. In February 1946 Reynolds agreed to furnish sufficient funds to finance the program. As Reynolds knew, the available working capital of the corporation at that time was only $15,000. Funds in the aggregate of $230,000 were thereafter supplied to the corporation by Reynolds, for which he received unsecured demand promissory notes of the corporation bearing interest at the rate of 3 per cent per annum as follows:

| | | | |
|---|---:|---|---:|
| Mar. 21, 1946 | $50,000 | Aug. 16, 1946 | $20,000 |
| Apr. 24, 1946 | 50,000 | Sept. 9, 1946 | 10,000 |
| July 8, 1946 | 25,000 | Sept. 24, 1946 | 25,000 |
| Aug. 2, 1946 | 10,000 | Oct. 4, 1946 | 25,000 |
| Aug. 9, 1946 | 15,000 | | |

During this period, the company had nothing to sell and was sustaining heavy losses. Engineers were employed, drawings were made, and working models or "prototypes" were constructed. The improved camera as developed was quite complex with over 300 separate parts, and its manufacturing costs proved to be much greater than originally anticipated. By October 4, 1946, Reynolds had furnished an aggregate of $230,000 to the corporation, but had neither demanded nor received either interest or principal on any of the corporation's notes. Reynolds was kept informed at all times as to petitioner's affairs. For the calendar year ended December 31, 1946, the manufacturing division of the corporation lost $368,860, and the entire corporation, including the film processing division which was to become Precision, lost $185,476.

On or about October 14, 1946, Reynolds, who was fully aware of petitioner's financial difficulties but was at that time short of cash, made an arrangement with the National Safety Bank and Trust Company of New York, hereinafter sometimes referred to as National Safety, whereby funds in the total amount of $350,000 would be available by National Safety to the corporation. Payments thereunder were to be made against the promissory notes of the corporation, bearing 3 per cent interest per annum, countersigned by Reynolds or his representative, and guaranteed by and secured by collateral put up by Reynolds, who deposited with National Safety securities having then a market value in excess of $350,000. Payments to the corporation by National Safety under this arrangement were as follows:

| | |
|---|---|
| Oct. 16, 1946 | $75,000 |
| Nov. 11, 1946 | 75,000 |
| Dec. 23, 1946 | 75,000 |
| Jan. 13, 1947 | 75,000 |

Against the foregoing payments petitioner delivered its promissory notes, countersigned and guaranteed by Reynolds, to National Safety. On February 5, 1947, Reynolds furnished $50,000 to the corporation against its demand promissory note. And on or about March 10, 1947, Reynolds made an arrangement with the Chemical Bank & Trust Company, hereinafter referred to as Chemical, whereby Chemical assumed the rights and liabilities under the promissory notes aggregating $300,000, which ran from the corporation to National Safety, and whereby Chemical was to loan the corporation additional funds of $200,000 against the corporation's promissory notes, in form bearing interest at 3 per cent per annum, countersigned by Reynolds or his representative. The repayment of all notes then running to Chemical was guaranteed and secured by Reynolds by the deposit of securities having a then market value in excess of $500,000. Payments to the corporation by Chemical were made as follows:

| | |
|---|---|
| Mar. 10, 1947 | $50,000 |
| Apr. 1, 1947 | 75,000 |
| Apr. 23, 1947 | 75,000 |
| May 15, 1947 | 25,000 |
| June 12, 1947 | 30,000 |
| Aug. 22, 1947 | 40,000 |

In January 1947 the corporation paid Reynolds $1,020, and on November 13, 1947, Chemical applied the balance of the corporation's deposit account, in the amount of $25,000, to repayment on account of petitioner's notes to it. On June 27, 1947, Reynolds personally furnished the petitioner corporation $30,000 against its demand note, bearing interest at 3 per cent per annum.

The following is a recapitulation of the financing transactions described above:

| | Reynolds | Safety | Chemical |
|---|---|---|---|
| Balance—Dec. 31, 1945 | $49,020 | | |
| *1946* | | | |
| Repayments | (28,000) | | |
| March 21 | 50,000 | | |
| April 24 | 50,000 | | |
| July 8 | 25,000 | | |
| August 2 | 10,000 | | |
| August 9 | 15,000 | | |
| August 16 | 20,000 | | |
| September 9 | 10,000 | | |
| September 24 | 25,000 | | |
| October 4 | 25,000 | | |
| October 16 | | $75,000 | |
| November 11 | | 75,000 | |
| December 23 | | 75,000 | |
| Balance—Dec. 31, 1946 | 251,020 | 225,000 | |
| (*Total $476,020*) | | | |
| *1947* | | | |
| Repayment (to clear old balance) | (1,020) | | |
| January 13 | | 75,000 | |
| February 5 | 50,000 | | |
| March 10 (bank transfer) | | (300,000) | $350,000 |
| April 1 | | | 75,000 |
| April 23 | | | 75,000 |
| May 15 | | | 25,000 |
| June 12 | | | 30,000 |
| June 27 | 30,000 | | |
| August 22 | | | 40,000 |
| November 13 | | | (25,000) |
| Balance—Dec. 31, 1947 | 330,000 | | 570,000 |
| (*Total $900,000*) | | | |

In the fall of 1947 Reynolds decided that it would be to his advantage to liquidate his interests in the corporation. Reynolds

brought suit in November 1947 upon the notes in the New York Supreme Court. The corporation defended on the ground that the advances by Reynolds were contributions to capital, but the issue was never brought to trial. In a contest between Reynolds and Maurer in connection with the election of directors of the corporation on February 11, 1948, Reynolds was victorious. The possible form that a termination of petitioner's business or of Reynolds' interests therein was to take, varied in the months from September 1947 to May 1948 when Reynolds finally disposed of his interest. Reynolds wished the terminating transaction to be arranged in such a manner that he might benefit taxwise to the greatest extent. Reynolds' investments were at all times carried on the books of the corporation as "loans" and were always referred to by all parties as such. With the exception of the repayments noted in the table above, none of the corporation's notes held by Reynolds or Chemical were repaid and no interest on any of said notes was ever paid.

Reynolds having assumed the complete management of the corporation in February 1948, in May of that year the shareholders of the corporation adopted a resolution to liquidate the corporation and sell its business and assets. During the period from February to May, positive though unsuccessful attempts were made by the management, i. e., Reynolds, to bring about a sale of the business and assets. Reynolds purchased and took over from Chemical the $570,000 of the corporation's notes held by it. His attorney and business representative had indicated, prior to this period, that he would be willing to sell the corporation for $100,000. Finally, buyers were found for Reynolds' interest in the corporation, his stock and notes, who were willing to pay $400,000. The buyers, Herman and Ben Cohen, hereinafter sometimes referred to as the Cohens, began the negotiations with the intention of, and on the assumption that, they were purchasing Reynolds' interests, but at Reynolds' insistence the transaction in its final form was cast as follows:

This transaction was composed of two contracts: (1) Between the Cohens and the corporation, and (2) between the corporation and Reynolds. The following documents embody these contracts:

COHEN BROTHERS
217 East Baltimore Street
Baltimore, Maryland

*May 17, 1948*

J. A. Maurer, Inc.
37-01 31st Street
Long Island City 1, New York.

Dear Sirs:

The undersigned hereby offer to loan to your company the sum of Four Hundred Thousand ($400,000.00) Dollars in cash upon the following terms and conditions:

1. That you will, within thirty (30) days from date of your acceptance of this offer, effect a compromise of the following claims now outstanding against your company for an amount not exceeding Four Hundred Thousand ($400,000.00) Dollars in the aggregate:

(a) Claim in principal amount of Five Hundred Seventy Thousand ($570,-000.00) Dollars held by Chemical Bank and Trust Company for loans made to your company and represented by promissory notes aggregating said amount, and

(b) Claim in principal amount of Three Hundred Thirty Thousand ($330,-000.00) Dollars held by Richard J. Reynolds for loans made by him to your company and represented by various promissory notes in that amount evidencing said demand loans.

2. That Mr. John A. Maurer will transfer to us, or to our nominees, simultaneously with the loan to J. A. Maurer, Inc. of the total sum of Four Hundred Thousand ($400,000.00) Dollars, One hundred thirty five (135) shares of the Common Capital Stock of the par value of $100.00 each of J. A. Maurer, Inc., now owned by Mr. John A. Maurer, said One Hundred Thirty five (135) shares of common capital stock to represent fifty percent (50%) of the total capital stock of all classes of J. A. Maurer, Inc. then issued and outstanding.

3. The delivery to us of the promissory note of J. A. Maurer, Inc. for the amount of said loan of Four Hundred Thousand ($400,000.00) Dollars, payable six (6) months from date thereof, with interest at five (5%) per cent per annum.

We hereby deliver to your attorneys, Coudert Brothers, No. 2 Rector Street, New York, N. Y., certified check for Fifty Thousand ($50,000.00) Dollars, duly endorsed, said check to be held and the proceeds thereof applied by said attorneys upon the following conditions:

(a) In the event this offer shall not be accepted by you on or before May 27, 1948, said certified check shall be returned to us by said attorneys upon demand.

(b) In the event this offer shall be accepted by you on or before said May 27, 1948, then your said attorneys shall be authorized to (1) deliver the proceeds of said Fifty Thousand ($50,000.00) Dollar check to Richard J. Reynolds or his nominee, upon delivery to said attorneys for the account of J. A. Maurer, Inc. of a full general release in favor of J. A. Maurer, Inc., executed by the holder or holders of said claims described in Paragraphs 1 (a) and (b) hereof, accompanied by the original promissory notes evidencing such claims, or (2) to return said Fifty Thousand ($50,000.00) Dollars to us or upon our order in the event said general release or releases and promissory notes referred in the last preceding subparagraph, shall not be delivered to J. A. Maurer, Inc. within thirty days from date of acceptance by you of this offer.

We further agree to advance to you or your order the balance of Three Hundred Fifty Thousand ($350,000.00) Dollars of the aforesaid loan upon your request and compliance with the terms of this offer, within thirty (30) days from date of acceptance by you of this offer. It is specifically understood that time is of the essence with respect to the payment by us to you of said Three Hundred Fifty Thousand ($350,000.00) Dollars and that in the event said amount shall not be paid to you in accordance with the terms of this paragraph within said thirty (30) day period, then and in such event the Fifty Thousand ($50,000.00) Dollars hereby delivered to your said attorneys, Messrs. Coudert Brothers, shall be forfeited by us as liquidated damages and not as a penalty and this agreement and all liabilities of the parties hereunder shall thereupon cease, terminate and come to an end.

The execution by you of a copy of this letter in manner set forth at the foot hereof shall constitute your acceptance of the within offer and a binding agreement between us on the terms herein set forth.

Very truly yours,

[Signed] Herman Cohen
[Signed] Ben Cohen

The above offer accepted and agreement acknowledged in all respects this _____ day of May 1948.

J. A. MAURER, INC.

By ------------------------------
 *President.*

*May 27, 1948*

Mr. Richard J. Reynolds,
Winston-Salem,
North Carolina.

Dear Sir:

We herewith submit to you the following offer to compromise your claims against this corporation, now aggregating Nine Hundred Thousand ($900,000.00) Dollars, represented by the promissory notes of this corporation now held by you and evidencing loans heretofore made by you and Chemical Bank and Trust Company to this corporation:

1. On or before June 26, 1948 (time being of the essence) we agree to pay to you or your order at the offices of our attorneys, Messrs. Coudert Brothers, No. 2 Rector Street, New York 6, N. Y., the following amounts, in full compromise and settlement of your said claims against this corporation:

(a) Four Hundred Thousand ($400,000.00) Dollars in cash, and

(b) An amount in cash representing interest at the rate of two (2%) percent per annum on Five Hundred Seventy Thousand ($570,000.00) Dollars principal amount of a portion of your claim, from May 26, 1948 to date of payment in full to you of said Four Hundred Thousand ($400,000.00) Dollars.

2. Upon payment to you at the offices of said attorneys, Messrs. Coudert Brothers, of the amount set forth in Paragraph 1 hereof, you are to deliver to our said attorneys on behalf of this corporation the following documents:

(a) Duly executed general releases signed by yourself and by Mr. Stratton Coyner, Mr. Vincent Catozella and Reynolds & Co. in favor of this corporation, its wholly owned subsidiary, Precision Film Laboratories, Inc., and John Maurer and Mary N. Maurer, and

(b) Signed resignations of Mr. Stratton Coyner and Mr. Vincent Catozella, as directors and officers of J. A. Maurer, Inc., and its wholly owned subsidiary, Precision Film Laboratories, Inc., and

(c) Letters signed and addressed to this corporation and said Precision Film Laboratories, Inc. by Mr. Stratton Coyner and Mr. Vincent Catozella, stating that neither of them during the term of office as directors and officers of said corporation has incurred any obligation enforceable against said corporations, other than to said Messrs. Coudert Brothers and S. D. Leidesdorf & Co. and any other creditor presently appearing on the books of said corporations, the extent of their liability in respect of such representations to be limited, however, to their voluntary appearance, when requested, as a witness on behalf of said corporations in any action or proceeding brought against said corporations by any person, firm or corporation claiming to have been engaged by them as such directors or officers, and

(d) The original promissory notes evidencing your said claims of Nine Hundred Thousand ($900,000.00) Dollars, and

(e) Certificates duly endorsed to this corporation by you and representing 500 shares of the preferred and 330 shares of the common capital stock of this corporation, being all of the capital stock of this corporation owned by you, said certificates to be cancelled and retired by this corporation upon receipt thereof, and

(f) Stipulations of discontinuance of all pending actions and proceedings in which you and this corporation are opposing parties, this corporation to deliver to you in exchange therefor full general releases and counterparts of said stipulations executed by this corporation and by said Precision Film Laboratories, Inc., John A. Maurer and Mary N. Maurer and by Messrs. Baar, Bennett & Fullen, in favor of yourself, Mr. Stratton Coyner, Mr. Vincent Catozella, Reynolds & Co., and Messrs. Coudert Brothers.

3. We further agree to deliver to you, simultaneously with the payments provided for in Paragraph 1 hereof, the bond of this corporation on which either Metropolitan Casualty Company or Commercial Casualty Company shall be sureties, assuring and guaranteeing that all claims of creditors of this corporation outstanding as of date of payment to you, not exceeding, however, the sum of Sixty Thousand ($60,000.00) Dollars will be paid in full when due or, in any event, within six months from date of said payment to you.

4. Certified check for Fifty Thousand ($50,000.00) Dollars has been deposited with said attorneys, Messrs. Coudert Brothers, with instructions to pay the proceeds thereof to you immediately upon delivery to them of the documents mentioned in Paragraph 2 (a) (b) (c) (d) and (e) hereof, said amount to represent part payment on account of the Four Hundred Thousand ($400,000.00) Dollars to be paid to you in accordance with Paragraph 1 (a) hereof.

Your execution and return to us of a copy of this letter in manner set forth at the foot hereof, shall constitute your acceptance of this offer and the terms of the agreement set forth herein.

Very truly yours,

J. A. MAURER, INC.
By [Signed] John A. Maurer
*President*

Accepted this *27* day of *May 1948.*
[Signed] Richard J. Reynolds
By Stratton Coyner
*Atty in fact*

The terms included in these letters were accepted by the addressees in toto. A condition implicit in the Cohens' offer to loan the $400,000 to the corporation was the acquisition and retirement by the corporation of the 330 shares of common stock and 500 shares of preferred stock owned by Reynolds.

From July 22, 1943, until the termination of Reynolds' interest in the corporation, the stock of the corporation was as follows:

Preferred stock $100 par_ 500 shares (owned by Reynolds)_ $50,000
Common stock $100 par__ 330 shares (owned by Reynolds)_ $33,000
 271 shares (owned by Maurer)___ 27,100 60,100

Total (common)__ 601 shares
Total capital stock issued and outstanding_____ $110,100

The total principal amount of notes outstanding to which Reynolds ultimately held rights was $900,000.

In 1947, in order to continue with the sales program of the company, the corporation had to arrange financing for many of its customers under conditional sales contracts. This was accomplished through the C. I. T. Corporation which required that Reynolds subordinate his claims against the corporation to those which C. I. T. might have. Reynolds agreed to such subordination.

The banks which furnished funds for the corporation at all times did so on the credit and collateral of Reynolds. The banks would not have made the loans to the corporation without the guarantee and collateral furnished by Reynolds.

Except for the transactions described above whereby financing of the corporation by Reynolds came through Maurer, no other shareholder of the corporation financed its operations over the period from its incorporation until Reynolds terminated his interest therein.

All of Reynolds' advances to the corporation were transactions entered into for the purpose of making a profit, and with the expectation or hope that the corporation would prosper in its postwar operations and would be able to meet its obligations to him.

The complete financial report of the corporation most proximate to the transaction of May 1948 which is in issue was the one dated December 31, 1947. The consolidated balance sheet of petitioner and Precision as of that date is as follows:

ASSETS

Current assets:

| | | |
|---|---|---|
| Cash | | $47, 620. 04 |
| Receivables: | | |
| Trade customers | $202, 496. 70 | |
| U. S. Treasury Dept. (Tax refund) | 15, 476. 87 | |
| Others | 16, 395. 14 | 234, 368. 71 |
| Inventories | | 776, 144. 24 |
| Total current assets | | 1, 058, 132. 99 |
| Fixed assets (net of reserves) | | 151, 628. 83 |
| Patents (net of reserves) | | 1, 924. 36 |
| Deferred charges and prepaid expenses | | 17, 137. 30 |
| Total assets | | 1, 228, 823. 48 |

LIABILITIES AND CAPITAL

Current liabilities:

| | | |
|---|---|---|
| Accounts payable | $156, 337. 96 | |
| Notes payable | 911, 563. 77 | |
| Accrued liabilities | 78, 968. 16 | |
| Provision for New York State taxes | 9, 578. 87 | |
| Total current liabilities | | $1, 156, 448. 76 |

U. S. Public Health Service (deferred)_____ $7, 651. 00

 Total liabilities_____ 1, 164, 099. 76

Capital stock:
 Preferred_____ $50, 000. 00
 Common_____ 60, 100. 00 110, 100. 00

Surplus:
 Capital surplus_____ 29, 346. 14
 Earned surplus (deficit) _____ (74, 722. 42) (45, 376. 28)

 Total liabilities and capital_____ 1, 228, 823. 48

The balance sheet for petitioner corporation exclusive of its subsidiary Precision reads as follows:

### ASSETS

Current assets:
 Cash_____ $19, 996. 80
 Receivables:
 Trade customers_____ $75, 478. 02
 Trade creditors_____ 386. 19
 Advances on merchandise purchases_____ 14, 318. 90
 Employees_____ 576. 72
 U. S. Treasury Department (income tax refund)_ 15, 476. 87
 Interest on U. S. Treasury bond_____ 108. 33 106, 345. 03

 Inventories _____ 689, 277. 05

 Total current assets_____ 815, 618. 88

Investment in Precision Film Laboratories, Inc. (Subsidiary) _____ 219, 920. 01

Fixed assets:
 Machinery and equipment (at cost plus appraisal excess) _____ $142, 356. 81
 Leasehold improvements (at cost) _____ 26, 010. 66

 Total_____ 168, 367. 47
Less: Reserve for depreciation and amortization_____ 61, 584. 61 106, 782. 86

Patents _____ 2, 021. 00
Less: Reserve for amortization_____ 1, 096. 64 1, 924. 36

Deferred charges and prepaid expenses:
 Service deposit_____ 250. 00
 Salaries and wages prepaid_____ 1, 284. 54
 Interest prepaid_____ 133. 00
 Insurance prepaid_____ 2, 152. 58
 Deposit on lease (U. S. Treasury bond) _____ 10, 032. 81 13, 852. 93

 1,158, 099. 04

LIABILITIES

Current liabilities:
 Accounts payable:
 Trade creditors_____ $135, 123. 55
 Trade customers _____ 690. 12
 Deposits on sales_____ 1, 200. 00 $137, 013. 67

 Notes payable:
 Chemical Bank & Trust Company_____ 570, 000. 00
 R. J. Reynolds_____ 330, 000. 00
 Trade creditors_____ 11, 563. 77 911, 563. 77

 Accrued liabilities:
 Interest _____ 25, 525. 86
 Royalty (R. C. A.) _____ 950. 56
 Payroll_____ 7, 345. 27
 Payroll taxes_____ 35, 691. 18
 Employees' savings bonds_____ 1, 080. 02
 State and local taxes_____ 602. 55 71, 195. 44

 Total current liabilities_____ 1, 119, 772. 88
Owing to Precision Film Laboratories, Inc. (Subsidiary)_____ 175, 503. 29

 Total liabilities_____ 1, 295, 276. 17
Capital stock and surplus:
 Preferred stock—$100.00 par value—5% cumulative
 Authorized 1,000 shares
 Issued and outstanding 500 shares_____ $50, 000. 00
 Common stock—$100.00 par value
 Authorized—2,000 shares
 Issued and outstanding—601 shares_____ 60, 100. 00
 Capital surplus _____ 29, 346. 14
 Earned surplus (deficit) _____ (276, 623. 27)

 Net capital deficit_____ (137, 177. 13)
Contingent liabilities_____ _____

 1, 158, 099. 04

The profit and loss statement for the year ended December 31, 1947, reads:

Sales_____ $717, 984. 45
Cost of goods sold:
 Inventory at beginning_____ $311, 370. 77
 Purchases of materials_____ 678, 008. 20
 Direct labor:
 Production_____ $209, 451. 39
 Engineering_____ 29, 946. 77 239, 398. 16

 Factory overhead_____ 322, 950. 59

 1, 551, 727. 72
 Inventory at end_____ 689, 277. 05 862, 450. 67

```
 
Gross loss from operations_____ ($144, 466. 22)
General and administrative expenses_____ 155, 728. 40
 _____
Net loss from operations_____ (300, 194. 62)
Other income :
 Discounts earned_____ $68. 24
 Interest earned_____ 195. 31
 Sale of scrap_____ 190. 63
 Sundries _____ 150. 00 604. 18
 _____
 (299, 590. 44)
Other deductions :
 Sales discounts_____ 2. 70
 Bad debts_____ 102. 86 105. 56
 _____
Net loss, carried to surplus_____ (299, 696. 00)
 ══════════════
```

The financial situation of the corporation in May 1948 was no better.

The item of inventory which appears on the balance sheet of the corporation above was overstated insofar as the then value thereof is concerned. This inventory consisted of component parts of the 16-millimeter motion-picture camera for professional use, which the corporation commenced manufacturing after World War II, and parts for its associated equipment. The corporation stocked approximately 300 parts to the camera alone and, in instances where it did not manufacture the parts itself but procured them, it stocked them in quantities of approximately 1,000. The market for the camera was very limited. And as of 1947 the prospective sales per year were not in excess of 100. The market for the product was highly competitive. The product itself was in a field characterized as a "rapidly evolving art" in which improvements and changes were necessary and to be anticipated, and product obsolescence was an ever-present hazard. The inventory was, in the months of late 1947 and early 1948, in large part obsolete. The parts were, in addition, faulty in manufacture and design, so that assembly of the finished camera involved reworking parts from the inventory so that they would fit and function properly. This reworking of faulty parts would, in turn, often necessitate the reworking of other parts in order that the end product would be salable. Service on the camera was also inefficient for these same reasons. This inefficiency would mean delay in the return of the camera to a customer, who very often was dependent on it for his livelihood. A note to the financial statement of the corporation for the year ended December 31, 1947, reads in part as follows:

The inventory, as priced, does not purport to represent present-day realizable values in the event of the sale thereof in the condition in which it exists. In our opinion, the values, as stated, will be realized only upon completion of inventories into finished goods and the sale thereof.

The actual value of the inventory was the subject of a letter by the business agent of Reynolds to the comptroller of the corporation on April 12, 1948, a time when Reynolds was attempting to find a purchaser for his interest. The body of this letter reads as follows:

The inventory of December 31, 1947 of J. A. Maurer, Inc., which we examined last week, we believe, should be reduced due to the following special circumstances:

1. While the parts used for completed products represented actual cost, the difference between the value used in the inventory and the retail sales price does not allow sufficient amount for sales and other administrative expenses.

2. The inventory is out of balance, there are a number of items of sufficient supply to last for a good many years. Due to the unbalanced condition of the inventory these excess parts should be reduced or in some cases written off.

3. The inventory contained a number of parts upon which machine work will be necessary before they can be considered as completed. Where these unfinished parts are in excess of current production needs, these items should be valued at zero.

Due to these special circumstances, we believe that the inventory has been over valued by from $250,000.00 to $300,000.00.

Will you please make the necessary reductions in the inventory according to the principals [sic] outlined in this letter?

If the entire inventory were used, no prospect of profitable operations of the corporation appeared. The finished camera at this time was selling at $2,985 and the unit cost of production was $3,800.

Petitioner corporation was insolvent prior to the settlement of Reynolds' claims in May 1947, and the value of its assets subsequent to the settlement exceeded its liabilities to nonstockholders, plus the amount of $400,000, by $50,000.

The advances in the total amount of $900,000 evidenced by notes in that amount held by Reynolds in May 1948 represented contributions by him of risk capital to petitioner and did not in reality or for tax purposes constitute indebtedness of petitioner to him.

OPINION.

KERN, *Judge:* This case presents an interesting example of what different tax consequences may be faced by a taxpayer because he casts a transaction in one form rather than another, even though the economic results of the transaction may be the same regardless of the form in which it is cast. In this case Reynolds, who dominated petitioner corporation and owned 75 per cent of its stock, had become financially involved in its business to the extent of over $900,000. Realizing at long last that it was an unprofitable involvement, he decided to put an end to it. Two other financial venturers, the Cohen brothers, appeared who were willing at a price to take over Reynolds' position in petitioner, and the bargaining between the Cohens and

Reynolds began on the simple and unsophisticated (taxwise) assumption that Reynolds was to sell and the Cohens were to buy Reynolds' interest in petitioner represented by stock and notes. After agreeing on the amount ($400,000), which the Cohens were willing to pay and Reynolds was willing to accept, the sophisticated advisers of Reynolds insisted that the transaction should take the complicated form described in our findings. Instead of a simple and direct sale by Reynolds of his interest in petitioner to the Cohens, which might have resulted in the loss of Reynolds being considered as a loss incurred in the sale of capital assets, the Cohens purportedly "loaned" $400,000 to petitioner (in partial consideration for which they received the minority stock interest of Maurer)[1] and petitioner in return for $400,000, which it had "borrowed" from the Cohens and purportedly paid to Reynolds, received from him a discharge of its obligations held by him in the amount of $900,000 and acquired his stock which was then retired. If there had been a direct sale by Reynolds to the Cohens of all of his interest in petitioner, represented by stock and notes, it is obvious that there would have been no contention on the part of respondent that petitioner realized any taxable income as a result of the transaction. If the Cohens had thereafter discharged and canceled $500,000 of the $900,000 of petitioner's notes outstanding, it is unlikely that respondent would have determined any tax liability against petitioner on account thereof in view of his own regulation (Regs. 111, sec. 29.22 (a)–13), which reads in pertinent part: "In general, if a shareholder in a corporation which is indebted to him gratuitously forgives the debt, the transaction amounts to a contribution to the capital of the corporation to the extent of the principal of the debt." However, the form of the transaction finally agreed upon at the insistence of Reynolds was the payment to him by the petitioner corporation of $400,000, a figure reached after bargaining between Reynolds and the Cohens, the surrender and forgiveness by Reynolds of petitioner's note in the amount of $900,000, and the contemporaneous transfer to petitioner of Reynolds' stock for retirement. This being the form of the transaction, the respondent has taken the position that petitioner, in spite of its unprofitable operation and desperate financial condition, realized taxable income in 1948 as a result of the transaction in the amount of over $500,000 and has determined deficiencies for the taxable years in the total amount of almost $200,000.

Respondent contends that his determination is correct since "the settlement by petitioner's creditor Reynolds of debts due him for less than the full amount thereof constituted a transfer for the best

---

[1] At this time the financial condition of petitioner was such that Maurer's stock was worthless. It figured in the transaction only as a means to give the Cohens complete stock control of petitioner after the retirement of Reynolds' stock without the necessity of reorganizing petitioner's formal capital structure.

price available," and therefore, under the authority of *Commissioner* v. *Jacobson*, 336 U. S. 28, "[t] he petitioner realized taxable income in the amount of $500,000 during the taxable year 1948 upon the cancellation of [this] indebtedness by its creditor * * * in the amount of $500,000."

The petitioner presents two contentions. The first is to the effect that as a matter of economic reality and for tax purposes the advances made by Reynolds to petitioner did not constitute an indebtedness of the corporation but constituted investments in the equity of petitioner. To quote from petitioner's brief, "the funds furnished by Reynolds to petitioner were intended as a capital investment at the risk of the business, and not as loans." Therefore, petitioner contends that in this case there can be no cancellation of indebtedness giving rise to taxable income under the doctrine of *United States* v. *Kirby Lumber Co.*, 284 U. S. 1, and *Commissioner* v. *Jacobson, supra.* In the alternative petitioner contends that even though the advances be considered as loans and as constituting an indebtedness, the effect of the transaction occurring in June 1948 was merely "to reduce the amount by which petitioner's liabilities exceeded the actual value of its assets," with the end result being not that the value of its retained assets thereby exceeded its liabilities, but that there "was a realistic downward adjustment of its liabilities in order to bring such liabilities into balance with the actual value of its combined assets as determined in an arm's-length transaction."

In connection with its first contention, petitioner cites many cases, including *Isidor Dobkin*, 15 T. C. 31; *Sam Schnitzer*, 13 T. C. 43; *Alfred R. Bachrach*, 18 T. C. 479; *Colony, Inc.*, 26 T. C. 30; *Gooding Amusement Co.*, 23 T. C. 408; *Emanuel N. (Manny) Kolkey*, 27 T. C. 37; *Gilbert* v. *Commissioner*, 248 F. 2d 399; *Erard A. Matthiessen*, 16 T. C. 781, affd. 194 F. 2d 659; and *Martin Dittmar*, 23 T. C. 789.

The question of whether advances made by a stockholder to a corporation constitute debts or contributions to capital usually arises in cases where the respondent has disallowed deductions claimed on account of the accrual or payment of alleged interest on such advances on the ground that such payments did not constitute interest on a real indebtedness. None of the cases cited by petitioner involve a determination by the Commissioner that the settlement by the corporation of the alleged indebtedness arising from the advances for a sum less than the principal amount of such alleged indebtedness constitutes the receipt of income by the corporation. However, regardless of how the question comes up, we can see no distinction in principle between the case before us and those cited by petitioner. In those cases, as in this, the ultimate question to be resolved was whether the advances constituted as a matter of practical reality (i. e., "for tax purposes") an equity investment in the business of

the corporation to which the advances were made, or a valid indebtedness within the meaning of the Internal Revenue Code.

In the recent case of *Gilbert* v. *Commissioner, supra,* the Court of Appeals for the Second Circuit has said that in determining this question the significant factor is "whether the funds were advanced with reasonable expectations of repayment regardless of the success of the venture or were placed at the risk of the business." In our opinion, the record before us clearly indicates that the funds advanced to petitioner, directly or indirectly,[2] by Reynolds were not advanced by him "with reasonable expectations of repayment regardless of the success of the venture" but were quite definitely "placed at the risk of the business." It was evident to all the parties concerned that the advances were made for the purpose of financing the development of a peacetime product which, it was hoped, might be such that it could be successfully sold in a competitive market. Only if and when such a product could be designed and profitably exploited could there be a repayment to Reynolds of the large amounts of the advances contemplated. The funds necessary for such an essentially capital purpose could not be borrowed from any outside source. The situation was typically one requiring the investment of risk capital rather than one justifying the extension of credit in the form of "an unqualified obligation to pay a sum certain at a reasonably close fixed maturity date along with a fixed percentage in interest payable regardless of the debtor's income or lack thereof." (See *Gilbert* v. *Commissioner, supra.*)

As we have pointed out, it was not reasonable to expect, nor was it expected that the advances by Reynolds to petitioner would be repaid unless and until the venture of petitioner for the financing of which the advances were made should prove to be successful, and no outside lender or investor would have made the necessary advances of funds to petitioner. In addition, we point out that the advances by Reynolds to petitioner were made by him without regard to the normal creditor safeguards,[3] and Reynolds made no efforts to enforce the notes evidencing the advances until he had decided to terminate and liquidate all of his interest in petitioner (and as a part of the mechanics of such termination and liquidation). It is interesting to note that during the litigation incident to Reynolds' attempt to obtain judgment against petitioner on the notes as a step in such liquidation, and when for a short time petitioner spoke with the voice of its minority stockholder and not that of Reynolds, it characterized the advances represented by these notes as contributions

---

[2] We consider that those funds nominally advanced to petitioner by banks, but only on the credit and collateral of Reynolds, were in reality advanced by Reynolds who ultimately acquired the notes evidencing these advances.

[3] Unlike the transactions prior to 1945, no security was asked of or given by petitioner securing the repayment of the advances here in question.

to capital and not a true indebtedness. No payment of interest or principal on these notes was ever made by petitioner prior to June 1948. The notes were subordinated to the claims of a creditor of petitioner.

Upon consideration of the entire record and, particularly, of the factors above mentioned we conclude that the advances here in question were in reality contributions of risk capital and did not give rise to an indebtedness on the part of petitioner corporation within the meaning of the Internal Revenue Code. In our opinion, it follows from this conclusion that the settlement of these advances for less than their face amount by the petitioner corporation did not constitute a cancellation of indebtedness giving rise to the realization of taxable income.

We have noted a matter which petitioner stresses on brief, namely, that there was here such a high ratio of nominal debt to acknowledged stock investment as to make applicable the principle of those cases dealing with so-called thin capitalization in which a disproportionate debt-equity ratio has been a controlling factor leading to a conclusion that advances by a stockholder to a corporation constituted in reality the contribution of risk capital. We have not relied upon this factor in reaching our conclusion because of our hesitancy in labeling this situation as an "extreme [situation] such as nominal stock investments and an obviously excessive debt structure." See *John Kelley Co.* v. *Commissioner*, 326 U. S. 521, and also opinions of Judges Medina and Waterman in *Gilbert* v. *Commissioner, supra*. Without passing on the merits of petitioner's contentions on this point, we merely observe that the ratio of claimed debt to acknowledged risk capital in this case is such that it in no way militates against the validity of our conclusion.

In view of our conclusions as outlined above, it is not necessary for us to discuss *in extenso* petitioner's alternative contention to the effect that even though the advances here in question constituted an indebtedness within the meaning of the Federal tax laws, the partial cancellation of the indebtedness did not result in a freeing of assets giving rise to taxable income but merely reduced the amount by which its liabilities exceeded the actual value of its assets, and at the most brought the amount of its indebtedness and the market value of its assets into approximate equilibrium. Upon this issue petitioner relies upon uncontradicted testimony concerning the obsolescence and lack of value of its inventory, upon the opinion testimony of several expert witnesses, and upon the value inferentially placed upon petitioner's assets by the transaction in June 1948 between Reynolds and the Cohens. Respondent relies upon petitioner's balance sheet and upon the testimony of one witness, unfamiliar with petitioner's busi-

ness, who made a computation of the "goodwill" of petitioner's subsidiary Precision in conformity with the principles set forth in A. R. M. 34 and reached a mathematical result indicating that the value of that "goodwill" was $421,983.75. Respondent would add this amount to the assets shown on petitioner's balance sheet, and would have us conclude that petitioner was at all times solvent, and even if insolvent by reason of an overstatement of the value of its inventory the partial cancellation of indebtedness resulted in its becoming solvent "to the extent of at least $265,000 plus 'going concern' value attaching to Precision."

With regard to this question of valuation, we have considered the book figures and analyses of them submitted by the parties, the testimony of expert witnesses, the calculation made under A. R. M. 34, and all of the other matters of record. We have considered the most valuable light thrown on this question to have been the figure finally arrived at by the contemporaneous bargaining of the Cohens and Reynolds. We think that the amount finally paid by the Cohens (in the form of the "loan" to petitioner) and received by Reynolds for the extinguishment of his interests in petitioner approximately represented the net fair market value of petitioner's assets without consideration of the $500,000 of Reynolds' "notes" in excess of the amount received by him. However, we are of the opinion that Reynolds wanted to sell much more than the Cohens wanted to buy, and it is our best judgment that the fair value of petitioner's assets as of the time immediately after the transaction here in question exceeded its liabilities by $50,000 upon the assumption that the advances by Reynolds constituted indebtedness. It is obvious to us that prior to this transaction petitioner was insolvent.

Therefore, even if we have erred in our conclusion that the transaction here in question was not a cancellation of indebtedness giving rise to taxable income, petitioner realized taxable income only to the extent of $50,000.

*Decision will be entered under Rule 50.*