J. CHR. G. HUPFEL CO., INC., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 9834.   Promulgated December 28, 1927.

*L. L. Hamby, Esq.*, for the petitioner.
*J. Harry Byrne, Esq.*, for the respondent.

TRUSSELL: As to the first issue the proof shows that J. Chr. G. Hupfel had for some years prior to 1887 owned and successfully operated, at a profit, a brewery business under his name in New York City, and had built up an established trade with many customers using his product. This condition had consequently created an intangible asset in the business in the nature of good will which was acquired by petitioner, together with all tangible assets, in that year in exchange for its total capital stock of $500,000. The value of the tangible assets acquired in this purchase was $625,290.86, and the indebtedness assumed was $225,290.86, the net value of tangible assets was $400,000. The average yearly earnings over a period of 11 months prior to the acquisition of the business by petitioner and two years following that acquisition were $44,674.20. The excess of net earnings over 10 per cent on net assets, capitalized at 15 per cent gives $31,161.40, which the Board finds is the value of the good will acquired for stock on that date.

On August 7, 1914, petitioner acquired by purchase the trade and good will, together with tangible assets of the Eppig Brewing Co. The consideration paid was $247,500, of which $86,244.32 was set up on the books of petitioner as representing good will purchased and then charged off as the corporation did not then carry a good will account. This amount of $86,244.32 represents good will acquired for cash.

The Revenue Act of 1918, under which the issue here presented is to be determined, permits the inclusion in invested capital of intangible assets acquired for stock in an aggregate amount not to exceed 25 per cent of the par value of the total stock of the corporation outstanding at the beginning of the taxable year. The value of the good will acquired by petitioner for stock on organization in 1887, which the Board finds to be the sum of $31,161.40, being less than 25 per cent of the capital stock outstanding at the beginning of the taxable years 1919 and 1920, should be included in invested capital for those years.

The purchase by petitioner of the trade and good will of the Eppig Brewing Co. for the sum of $86,244.32 represents a capital expenditure and it is accordingly included in invested capital for 1919 and 1920. *American Seating Co.*, 4 B. T. A. 649; *Goodell-Pratt Co.*, 3 B. T. A. 30; *Market Supply Co.*, 3 B. T. A. 841; *Rockford Brick & Tile Co.*, 4 B. T. A. 313.

In respect to the second issue, the Board has followed the rule laid down by the United States Circuit Court of Appeals in the case of *Red Wing Malting Co.* v. *Willcuts*, 15 Fed. (2d) 626, that obsoles-

cence of good will of a business is not the subject of a claim for deduction under section 234 (a) (7) of the Revenue Act of 1918. *Manhattan Brewing Co.*, 6 B. T. A. 952; *Olt Brothers Brewing Co.*, 6 B. T. A. 974; *Secor Hotel Co.*, 7 B. T. A. 158.

On the third issue presented the proof shows beyond question the obsolescence of the brewing plant of petitioner as a result of national prohibition legislation. Petitioner alleges that prior to January 15, 1919, the date of the ratification of the Eighteenth Amendment by the last of the necessary number of States, it had decided to liquidate its business beginning with the date of such ratification, without awaiting the expiration of the 12-month period which would elapse before national prohibition would become effective. Federal regulations prior to 1919 already forbade the manufacture or sale of beer from cereals after July 1, 1919, except for export, and petitioner's business was the manufacture of beer in bulk for sale in New York City and surrounding territory through various saloons. The evidence supports petitioner's claim of a final determination in January, 1919, to liquidate its brewing business beginning at once. No further contracts were made for supplies, its system of advancing credits to saloonist customers and financing their operations ceased, and it began, on the other hand, to collect and close up such accounts as could be collected. This action is consistent only with a determination to cease operation, as the marketing of its product was dependent on the maintaining of its fixed trade and this could only be done through the continuance of the credit system by which it controlled the business of its customers. The only thing left for petitioner to do in January, 1919, so far as its brewery plant was concerned, was to either liquidate or to continue as a manufacturer of nonalcoholic cereal beverages and this would require the construction of a bottling plant, which petitioner did not have, at cost of approximately $500,000, with profitable operation most doubtful, as a new market, through other mediums than the saloon, would have to be secured.

Faced with these conditions, petitioner began liquidation on January 15, 1919, of its business by the manufacturing of supplies on hand or under contract into near beer and disposed of this through such of its customers as remained in business. It had no dealcoholizing plant and used a crude process of boiling out the alcohol. After ceasing manufacture in 1920 it continued to dispose of its product on hand, and during 1921 and part of 1922, purchased near beer from another brewer for sale to its old customers and in this way received some return on the trade and custom it had built up in past years. While doing this it began, in 1921, the remodeling of its brewing

plant for general commercial use. Under the proof as to conditions respecting petitioner's business, the lack of a bottling plant, a trade wholly with the old time saloon and with legislation in effect in January, 1919, which called for national prohibition in 12 months and with the business in process of liquidation, we must conclude that the resulting losses of value of petitioner's plant as a brewery due to these definite and known conditions were completely established. Up to January, 1919, although faced with legislation which would shortly put an end to its business, it continued in operation and made no deduction for obsolescence in its plant for the year 1918. For the year 1919 it appears to have made a deduction of $117,286.95 for obsolescence of buildings designed and constructed for brewery purposes, this being its determination of the total reduction in value of these assets by obsolescence.

On its brewing equipment and fixtures it made a similar deduction for obsolescence for 1919. The Commissioner allowed in full the obsolescence claimed on equipment for the year 1919 and disallowed the claim for obsolescence of the assets consisting of brewery buildings. We are of the opinion that the evidence proves that the obsolescence of Buildings A, B, C, D, and E began on January 16, 1919, and was completed on January 16, 1920. The fact that these buildings were used for a period subsequent to January 16, 1920, does not alter that fact. Such use has been shown to have been incident to the final liquidation of the business decided and entered upon in January, 1919. In the remodeling and reconstruction of the buildings involved 46.9 per cent of the depreciated cost of Buildings A, B, C, and D and 4.8 per cent of the depreciated cost of Building E represented the portions demolished and no salvage was secured from this operation. The cost of these buildings unextinguished by depreciation taken in past years was $115,191.54 for Buildings A, B, C, and D and $142,225.81 for Building E. Applying the percentages demolished we have $54,024.83 for Buildings A, B, C, and D, and $6,826.84 for Building E, or a total of $60,851.67, allowable as obsolescence for the years 1919 and 1920. Petitioner made its return for the fiscal year from October 1 to September 30, and the total amount of $60,851.67, determined as obsolescence is allowable in the amount of $43,103.27 for the fiscal year 1919 and $17,748.40 for the fiscal year 1920. *Manhattan Brewing Co.*, *supra*.

The fourth issue is upon the disallowance by the respondent of certain debts charged off by petitioner and deducted from gross income in 1919 and 1920. Prior to the advent of prohibition the value to a brewer of a saloonist as a customer, was measured by his ability to sell beer rather than his personal solvency, and advances were made him by the brewer with no other security than a chattel

mortgage on the bar fixtures purchased with the money advanced, and in many cases without even this security. There was before prohibition, a market for bar fixtures or the lease of an established saloon. In case of foreclosure of such a chattel mortgage a substantial amount could be realized from the sale of the security. The indebtedness secured by such chattel mortgage was being automatically paid off from week to week by the debtor through credits on the beer purchased by him from the brewer. In time, if the business continued, the entire indebtedness would be thus paid. When petitioner in January, 1919, began the liquidation of its brewing business, it ceased making further loans to its customers and began to attempt to realize on the debts of such customers on its books. Many of these saloonists had no property. Many had been financially irresponsible at the time the accounts were first opened. With such debtors the only source from which to satisfy a judgment was the bar fixtures covered by the mortgage, and in 1919 these could not be sold for lack of purchasers. No one was then going into the saloon business. Many were going out. Some bar fixtures foreclosed on by petitioner could not be sold at any price and were finally used as fuel.

At the close of the fiscal year ending September 30, 1919, petitioner charged off as bad debts from these saloonists' accounts the sum of $162,484.91, and deducted these from gross income in making its return for that year. Some of these debts represented the total indebtedness of the particular customer where petitioner could not secure payment of any amount and the debtors were known to him to be insolvent. Some of the amounts charged off in this total represented a portion of the indebtedness of customers, part being held on the books because the debt was not considered entirely uncollectible. In making its return for the fiscal year 1920, petitioner charged off similar items of indebtedness in the total amount of $40,271.93. This latter sum represented in some cases the balance of debts, a portion of which had been charged off in 1919. In other cases the debts charged off represented portions of individual debts determined in 1920 to be partially uncollectible, and others represented debts determined in that year to be wholly uncollectible. The total amounts charged off in both 1919 and 1920 included some items representing the cost of fixtures loaned to customers by the petitioner.

The proof shows very clearly that the evidence of insolvency and financial irresponsibility of the individual debtors and the practically worthless character of the chattels covered by the various mortgages, on which the petitioner based his determination of the uncollectibility of these various debts, amply justified such a conclusion and its correctness is further indicated by the fact that in the six years following the charging off of these debts, less than $2,000 out of the

total of more than $200,000 has been collected. In *Egan & Hausman Co.*, 1 B. T. A. 556, the Board said:

In adjusting their accounts and debts business men are called upon to use sound business judgment and prudence and are justified in eliminating from their assets such accounts and debts as are past due and which they are satisfied that they can not realize upon within some reasonably determinable period.

The fact that during the year in which these debts were charged off and following that year the petitioner continued to do business with these debtors does not negative the correctness of his determination as to the uncollectibility of the debts. *Midland Coal Co.*, 1 B. T. A. 311. In the present case, however, the proof shows that the business relations of petitioner with these creditors subsequent to the charging off of these debts were not of a character indicating to any degree a belief in their solvency. Sales to them were for cash without discount, credit being extended in some cases for one week in a small amount, and there were no advances of money to them as formerly. The Revenue Act of 1918, section 234 (a) (5) permits deduction of " debts ascertained to be worthless and charged off within the taxable year." That portion of the total of $162,484.91, charged off in the year 1919, representing debts ascertained in that year to be wholly worthless and charged off in their entirety, is a proper deduction for 1919. This amount is found to be $110,704.97. Applying this same rule to those debts deducted in 1920 and disallowed by the respondent, we find $33,760.17 as properly allowable in that year of the total sum of $40,271.93 then charged off and deducted by the petitioner. This latter amount should be increased by $44,378.88, representing that portion of the total indebtedness charged off in 1919 and not allowable as a deduction in that year because composed of portions of debts not finally determined to be wholly uncollectible until 1920, but for this reason proper for allowance in the latter year. *Joseph E. Reed, Estate*, 2 B. T. A. 1198; *Mason Machine Works*, 3 B. T. A. 745; *Patrick J. Shouvlin*, 3 B. T. A. 499. The totals allowable for 1919 and 1920 of the entire amounts of debts charged off by the petitioner for these two years and disallowed by the respondent are thus determined to be $110,704.97 for 1919 and $78,139.05 for 1920. The balance of the entire amount involved for the years 1919 and 1920, or the sum of $13,912.82, is composed of (a) the amounts of $2,139.49 of the sum for 1919, and $2,513.32 of the sum for 1920, or a total of $4,652.81, representing the value of certain fixtures loaned to various customers by petitioner; (b) the sum of $500.13 in respect of which petitioner admits inability to furnish any information; and (c) the sum of $8,759.88, which represents parts of various debts charged off where there is no evidence to show whether the balance was later

charged off or is still maintained on petitioner's books. With respect to the first of these three items it is evident that these charges do not represent debts and accordingly can not be included. Item (b) can not be included as petitioner does not know what it represents, and item (c) is not allowable as it can not be determined when the debts, a portion of which it represents, were finally determined to be uncollectible or whether they were ever so determined.

The deficiencies should be redetermined in accordance with the foregoing findings of fact and opinion.

Reviewed by the Board.

*Judgment will be entered upon 15 days' notice, pursuant to Rule 50.*