Harry Levine and Leona Levine v. Commissioner. Louis Levine and Rae B. Levine v. Commissioner.
Levine v. Commissioner
Docket Nos. 89986, 90026.
United States Tax Court
T.C. Memo 1963-230; 1963 Tax Ct. Memo LEXIS 112; 22 T.C.M. (CCH) 1164; T.C.M. (RIA) 63230; August 28, 1963
*112 Lester H. Salter and James R. McGowan, for the petitioners. Frederick A. Griffen, for the respondent. OPPER
Memorandum Findings of Fact and Opinion OPPER, Judge: Respondent has determined deficiencies in income tax and addition to tax in these consolidated proceedings as follows: Addition to tax,
Income tax
sec. 6651(a)
Petitioners
Year
deficiency
I.R.C. 1954
Harry and Leona Levine
1957
$82.95
1958
$16,525.74
Louis and Rae B. Levine
1958
$16,804.88 In his answer to the amended petition respondent claims increased deficiencies in income tax and addition to tax as follows: Addition to tax,
Income tax
sec. 6651(a)
Petitioners
Year
deficiency
I.R.C. 1954
Harry and Leona Levine
1957
$96,935.09
$14,540.27
1958
26,410.42
Louis and Rae B. Levine
1958
22,487.02
The questions remaining for determination are (1) the extent of petitioners' claims against a bankrupt corporation; (2) whether these claims were worthless as of December 31, 1958; (3) whether, if worthless, the claims were business bad debts; (4) if so, whether gains from sales of corporate stock during the years in issue are required to be treated as ordinary income; and (5) whether Harry and Leona Levine's failure to file a timely return for 1957 was due to reasonable *113 cause and not due to willful neglect within the meaning of section 6651 of the 1954 Code. The deductibility as business bad debts of claims against two other corporations is also in issue on the same grounds as (6) above. Findings of Fact The stipulated facts are hereby found accordingly. Petitioners Harry Levine (hereinafter sometimes called Harry) and Louis Levine (hereinafter sometimes called Louis) are brothers who have participated on an equal basis in business ventures for a number of years. Louis and his wife timely filed their joint Federal income tax return for the calendar year 1958 with the district director of internal revenue at Boston, Massachusetts. Harry and his wife timely filed their joint Federal income tax return for the calendar year 1958 with the district director of internal revenue at Boston, Massachusetts. At all times material hereto, petitioners filed their Federal income tax returns on the cash basis and their taxable year was the calendar year. Issue No. 1 During the years 1951 through 1958, petitioners were interested, through ownership, directly or indirectly by one or more means, including relatives or controlled corporations, or management, in the *114 following enterprises including Commonwealth Plastics Corporation (hereinafter called "Plastics") which were conducted either in a corporate, partnership, or trust form and in all but five of which they participated in management. * *115 Ownership
Name
interest
Kind of business
Plastics and related businesses
a. Plastics
A, B
Manufacture of plastic buttons, jewelry, and
toys.
New England Plastics Co.
A
Assembly and sale of costume jewelry.
H & L Plastics Corp.
A
Corporation resulting from reorganization of
New England Plastics.
U.S. Plastic Products Corp.
A
Manufacture of cast acrylie sheets, raw ma-
terial for Plastics. Acquired as a source of
supply.
Aberdeen Button Corp.
Purchase and sale of finished buttons.
Rico Jewelry Co.
A
Manufacture of jewelry combining plastic and
metal.
Commonwealth Products Corp.
A
Assembly, storage, and shipping of plastic
products.
Morton Plastics, Inc.
A
Export and sale of surplus plastics materials
not used by Plastics.
Fisherville Realty Trust
A
Industrial Building, originally purchased for
expanding Plastics. Was not used for this
purpose and leased to several tenants.
Fisherville Water Co.
A
Water company for homes in the vicinity of
the Fisherville property.
b. Plastimac, S. A. Manufacturors
Two Mexican companies producing the same
Plasticas, S. A.
A
line as Plastics.
c. West Indies Plastics Corp.
A
Manufacture of plastic doll bodies.
Cosmopolitan Doll and Toy Co.
D
Assembly and sale of plastic dolls.
Haskins Plastics
A
Assembly of jewelry and manufacture of doll
parts for Cosmopolitan Doll.
Miniature Fashions, Inc.
A
Operation to dress dolls produced by Cosmo-
politan Doll.
d. Superior Plastics Co., Inc.
B
Manufacturer of custom-molded plastic items
noncompetitive with Plastics.
Oakley Building Land Trust
A
Building used for operation of Superior
Plastics.
e. Chemtex Chemical Corp.
A
Manufacture of plastic buttons by a new
process.
f. Packaging Plastics, Inc.
A
Manufacture of polyethylene bags.
g. Commonwealth Wire and Cable
Manufacture of plastic-coated wire.
Co.
A
h. Florabelle Plastics Corp.
A
Importers of polyethylene flowers from
France.
i. Dual Molding Corp.
B
Manufacture of plastic mannequins by a new
process.
Franco Plastics
Sales company for Dual Molding Corp.
j. West Indies Pearl Co.
A
Manufacture of imitation pearl beads.
Pearl Pigments Corp.
A
Manufacture of synthetic pearl essence.
Caribe Plastics Corp.
A
Manufacture and assembly of imitation pearl
beads.
Other manufacturing operations
a. Disco Industries
A
Zipper manufacture by a new method.
Harron Machine Co.
A
Owns machines used by Disco.
b. Diolectric, U.S.
A
Manufacture of miniature parts for the elec-
tronics industry.
c. Superior Manufacturing Co.
A
Manufacture of screw machine products.
d. CO2 Fire Equipment Co.
C
Fire equipment.
Pyrene Fire Extinguisher Co.
C
Not shown.
Real estate investments
a. Loch Raven Village Apartments,
Realty.
Inc.
A
Fitch Furnishings Co.
A
Partnership leasing furniture to tenants of
Loch Raven.
b. 137 W. 42d St. Corp.
A
Realty.
c. Puerto Nuavo Realty
A
Realty.
Miscellaneous
a. Vernon Productions, Inc.
B
Television production.
b. Puritan Hotel, Inc.
A
Hotel.
Somerset Hotel, Inc.
A
Hotel.
c. Michigan Gas and Electric Co.
Utility.
d. U.S. Bobbin and Shuttle Co.
A, C
Not shown.
e. Hotel Corp. of America
A
f. Young Spring and Wire Corp.
A, C
Manufacture of auto seats, farm and radio
equipment.
g. York Sage and Lock Co.
B
Manufacture of safes, locks, and vaults. * A - Harry and Louis directly.
C - Baker Industries, Inc.
B - Commonwealth Plastics, Inc.
D - Harry and Louis through Mike Rubin. Harry and Louis each owned 50 percent of the stock of Commonwealth Plastics, Inc. (hereinafter called Plastics, Inc.). Plastics, Inc., is primarily a holding company for several of petitioners' investments. Among other investments, Plastics, Inc., owned a controlling interest in Plastics, Superior Plastics Co., Inc., and Dual Molding Corp.
Petitioners owned an interest in Baker Industries, Inc. Among other ventures, Baker Industries owned a chemical company in Pennsylvania, a metallizing company in New Jersey, an interest in Young Spring and Wire Co., and Pyrene Fire Extinguisher Co. Harry and Louis loaned money to Commonwealth Products Corp., Plastics, Inc., and U.S. Plastic Products Corp. In addition, Harry and Louis frequently loaned money to people associated with them in their various enterprises; they loaned money to Solomon Baker, head of the accounting firm which handled petitioners' accounting work and who was instrumental in their acquisition of an interest in Baker Industries; they loaned money to an inventor of an extruding machine; Louis loaned money to Harry Mart, *116 an inventor of a cap for dispensing shaving cream that the Levines tried unsuccessfully to develop in their Plastics plant; and Harry loaned money to the principal officer of Commerce International, a company manufacturing three-dimensional glasses for which Plastics was providing inexpensive frames. In 1955 or 1956, Cosmopolitan Doll and Toy Co. (hereinafter called Doll), a large customer of West Indies Plastics Corp. and also a customer of Plastics, was going out of business. Petitioners and Jack Hyatt, who supplied Doll with boxes, did not want to lose the account. Hyatt and petitioners bought the business in order to keep it going. Hyatt, petitioners, and Simon Berman, who operated the business, each received one-third of the stock. Mike Rubin, Louis' son-in-law, held the joint one-third interest of Louis and Harry for purposes of convenience. Berman had little or no money. Hyatt and petitioners were to see that Doll was properly financed through loans after the first investment in common stock. Hyatt would provide one-half of such loans and petitioners would provide the other one-half. Edward W. Carlson, in addition to serving as secretary and assistant treasurer for Plastics, *117 also took care of the "personal accounts" of both Levines. Louis would tell Carlson that Hyatt was putting up his share of the loans and that it would be necessary to equal that amount. Carlson would then handle the mechanics of the transactions and supply the money from whatever was the most convenient source at the precise moment. During 1956, 1957, and 1958, a series of advances was made to Doll. Doll issued notes for some of the advances as follows: Number
Date of note
Note due
Amount
Payee
105
5/31/56
On demand
$25,000
Plasties
106
5/31/56
On demand
25,000
Harry and Louis
306
11/19/57
3/19/58
5,900
Plastics
311
12/ 4/57
6/ 5/58
5,000
Plastics
326
12/19/57
2/11/58
10,000
Plastics, Inc.
327
12/19/57
3/11/58
10,000
Plastics, Inc.
328
12/19/57
4/10/58
10,000
Plastics, Inc.
329
12/19/57
5/12/58
10,000
Plastics, Inc.
330
12/19/57
6/10/58
10,000
Plastics, Inc. With the exception of note 106, for which Harry and Louis provided the funds from their personal accounts, the advances were made from Plastics' bank account. An additional advance from Plastics to Doll by check dated March 17, 1958, in the amount of $15,000 was entered on the books of Plastics as a loan receivable from Doll. Harry and Louis advanced $11,000 to Doll on December *118 30, 1957. Note 306 was discounted at the Bensonhurst National Bank on November 27, 1957. Notes 326 through 330, issued on December 19, 1957, were discounted on the following day at the Bensonhurst National Bank. Although the payee of notes 326 through 330 was Plastics, Inc., the payee was considered to be Plastics and they were endorsed as such. Plastics had a line of credit with the Marine Midland Trust Company of New York (hereinafter called the bank) for a number of years. Louis would meet periodically with Daniel P. Adams, administrative vice-president of the bank, to determine the amount of credit which Plastics required. In May of 1957, the bank extended to Plastics credit in the amount of $500,000. At that time, Adams and Louis agreed that these funds were for Plastics' business and should not be used for petitioners' personal purposes or purposes other than Plastics' business. Adams was aware that petitioners were financially interested in Doll, and Louis informed Adams that the advances from Plastics to Doll were on behalf of petitioners. Louis was aware that these advances from Plastics were in ostensible violation of the line of credit from the bank. He therefore kept Adams *119 informed and notified Adams that Plastics would be repaid in the event of loss. On April 24, 1958, Doll petitioned the United States District Court for the Eastern District of New York for relief under Chapter XI, section 322, of the Bankruptcy Act, Early in June 1958, Louis attended a meeting with the attorney for the creditors of Doll. Louis felt responsible to these creditors, since they had in part extended credit to Doll upon the knowledge that the Levines were the owners of the corporation. Louis proposed that, if the court would approve a plan for a 30 percent settlement, West Indies Corp. and Plastics would subordinate their claims until the rest of the creditors were paid 30 percent of their clams. This offer by Louis was accepted, and, on or about June 23, 1958, Doll amended its petition in bankruptcy by filing an "Amended Plan of Arrangement," which stated in part as follows: 2. The unsecured debts of the debtors * * * shall be settled, satisfied and discharged by the payment, after confirmation of the amended plan of arrangement, of thirty (30%) per cent of their respective debts, payable five (5%) per cent on October 31, 1958; five (5%) per cent on December 24, 1958; *120 five (5%) per cent on July 1, 1959; five (5%) per cent on October 1, 1959; five (5%) per cent on January 1, 1960 and five (5%) per cent on April 1, 1960, until the entire thirty (30%) per cent as provided herein shall have been paid. a. In consideration of the acceptance of the foregoing amended plan of arrangement by the general unsecured creditors of the Debtors, the Debtors will procure from West Indies Plastics Corp. and Commonwealth Plastics Corporation, creditors of the debtors holding the following credits: West Indies Plastics Corp., $169,669.33; Commonwealth Plastics Corp., $180,053.86, their consent and agreement to subordinate the payment of their respective claims, in their entirety against the Debtors until the consideration of the 30% payable upon the claims of the unsecured creditors under the terms of this amended plan, shall have been paid and received by said creditors as above set forth. b. As part of the consideration for the acceptance of this amended plan by the general unsecured creditors and as part of the terms of this plan, the Debtors will procure from Whitney & Co., E. F. Dodge Paper Box Corp., Orange Paper Box Corp., and Wachusett Corrugated Corp. * * *121 * their consent and agreement to accept the sum of $40,000.00 in full payment, satisfaction and release of their said claims in their entirety * * *. This amended plan of arrangement required the consent of all affected creditors and the approval of the court. The consent of all creditors and the approval of the court was not secured until about November 3, 1958, on which date the court officially confirmed the amended plan of arrangement. In connection with this bankruptcy proceeding, Oscar Gang, a Certified Public Accountant, was appointed to examine the affairs of Doll. Gang's firm prepared from the books and records of Doll the following balance sheet, which appears on that corporation's income tax return for its fiscal year ended March 31, 1958: Assets
Cash
$ 6,328.64
Notes and accounts receivable
220,767.14
Inventories
360,680.85
Prepaid expenses and supplies
93,971.92
Mortgage and real estate loans
1,300.00
Buildings and other fixed depreci-
able assets
156,786.88
Other assets
11,127.36
$850,962.79
Liabilities and capital
Accounts payable
$208,249.87
Bonds, notes and mortgage payable
(maturing in less than one year)
692,906.18
Accrued expenses
74,689.21
Other liabilities
140,001.53
Capital stock
125,000.00
Earned surplus and undivided
profits (deficit)
(389,884.00)
$850,962.79
*122 In May 1958, an experienced appraiser of doll-manufacturing companies and inventories, Arthur Albert & Co., was appointed to appraise the assets of Doll. William H. Wohlstetter, a partner of Arthur Albert & Co., spent eight days on this assignment, during which he personally inspected all of the personal property of the debtor, consisting of machinery, equipment, dolls, work in process, raw materials, supplies, piece goods, and other assets. Arthur Albert & Co. reported to the district court that "the total appraised value of the personal property of the debtor" was $87,500, consisting of $62,500 realizable on inventory and $25,000 on machinery and equipment. In appraising inventory, Arthur Albert & Co. "used the quantities as set forth on the inventory submitted by the debtor dated April 23, 1958." As of April 24, 1958, the books of Doll reflected a value assigned to "inventory" of approximately $382,500 and a value assigned to depreciable assets of approximately $156,000. Under the amended plan of arrangement, the general unsecured creditors, whose claims were prior to those of Plastics, were to receive their 30 percent in six installments of 5 percent each. Doll was unable to meet *123 the second such 5 percent installment due in December 1958 and in that month called a meeting of its creditors to explain the situation. At this December meeting, the creditors were told that Doll's business had been bad, that it had now reached the end of its business season, and that it did not then have the funds to meet the second 5 percent payment. The creditors agreed to an extension of the second payment until April 1959. In May 1959, Doll made a second 5 percent installment payment. This was the last payment made. The unsecured creditors received 10 percent of their accounts and Plastics and the Levines never received anything. As of December 31, 1958, neither petitioners nor Plastics had any reasonable chance to receive anything from Doll. Doll transacted business with Plastics during 1959, and the last business transaction occurred on about November 19, 1959. Doll ceased doing business in 1959. At that time Doll had only nominal assets left. Petitioners were not listed as creditors of Doll and did not individually enter a claim in the bankruptcy as creditors of Doll. The amount listed for Plastics as a creditor of Doll, $180,053.86, included the $36,000 advanced personally *124 by petitioners, the $100,900 advanced by Plastics, and trade receivables resulting from the sales of merchandise from Plastics to Doll. The advances from Plastics to Doll were recorded on Plastics' books as loans receivable if no note was given, or as notes receivable in the event that a note was given by Doll. No reference was made to the fact that the loans were on behalf of petitioners. At the conclusion of the annual audit by Plastics' accounting firm of Baker & Baker in late July or early August 1958, Edward Creiger, a partner in the firm who had handled Plastics' and petitioners' accounting work for many years, made the following adjusting entries on Plastics' books: Detail
Dr.
Cr.
Loans Receivable - Harry and Louise Levine
$100,900.00
Accounts Receivable - Cosmopolitan Doll & Toy
Corp.
$45,900.00
$145,900.00
Loans Receivable - Cosmopolitan Doll & Toy
Corp.
15,000.00
Notes Receivable - Cosmopolitan Doll & Toy
Corp.
40,000.00
To reclassify advances
Notes Receivable
104,132.15
Loans Receivable - Harry and Louis Levine
100,900.00
Loans Payable - Harry and Louis Levine
3,232.15
To record repayment by Messrs. Harry and
Louis Levine (see letter to Mr. Adams
dated Sept. 19, 1958) Creiger was aware of the arrangement *125 for financing Doll. Some time after January 1958, Creiger became aware of the fact that Plastics had made advances to Doll. At that time, Creiger did not know that notes were given to Plastics or how the advances had been recorded on Plastics' books and he became aware of the bankruptcy proceeding some time after the petition in bankruptcy was filed. Louis also did not know how the advances were recorded on Plastics' books. Creiger was also aware of the informal restriction placed upon the credit extended by the bank. It was his opinion that the receivables was incorrectly carried. After discussing the matter with Louis, he made the adjusting entry. As a result of this adjusting entry, the notes from Doll to Plastics were endorsed over to the Levines as of May 31, 1958. On May 19, 1958, Adams sent the following letter to Carlson interest on the Hotel Corporation of America notes. Each check was in the amount of $1,625.40. We are holding this money in cash collateral. Please speak to Louis about it and ask him whether we should apply this money to permit reduction of the [Plastics] debt or, since it is small and in an odd amount, might it not be better to continue to hold it in cash *126 collateral until we get further payments which can make a real reduction. Don't forget that someone is going to give me the dope on the [Doll] situation and show me how [Plastics] is going to collect its money. On May 20, 1958, Carlson answered as follows: This will acknowledge your letter of May 19th and to advise you that you may keep the two checks in the amount of $1,625.40 in your cash collateral for the time being. The next time that Louie comes in to see you, which I believe will be shortly after June 1st, you will discuss this matter along with the [Doll] situation in detail. In June of 1958, Louis met with Adams and explained to him that petitioners would reimburse Plastics for the monies that were advanced through funds that they would soon have in their possession as a result of the sale of Hotel Corporation of America stock. On or about September 10, or 12, 1958, Adams, Louis, and Creiger again met in New York. Adams criticized petitioners for violating the agreement with the bank and approved petitioners' proposal for dealing with the situation. Adams also approved the adjusting entry which had been made. On September 19, 1958, Louis sent the following letter to Adams: *127 Reference is made to our conference of last week, during which you [were?] advised that the accommodation advances made by [Plastics] to [Doll] had been made in behalf of [Harry and Louis]. Therefore, the outstanding balance on account of such advances as at May 31, 1958 in the amount of $100,900 was an obligation of [Harry and Louis] to [Plastics]. In accordance with the arrangements made at our conference, such obligation is repaid to [Plastics] effective as at May 31, 1958 by the transfer of certain notes held by [Harry and Louis] to [Plastics]. The following list of notes, together with other notes, are presently being held by you as support for the loans made by your bank to [Plastics], and in accordance with our arrangements, the following listed notes are to become the property of [Plastics] as at May 31, 1958: * * *
Total
$104,132.15
We would appreciate your making the necessary arrangements so that [Harry and Louis] may properly transfer the above listed notes to [Plastics]. We have, therefore, agreed that in consideration for making these arrangements [Plastics] will use the proceeds of the collection of the above listed notes to reduce its indebtedness to your bank. As a matter *128 of fact, since May 31, 1958 the above listed notes due from R. Gryzmish have been collected, and the proceeds of such collection used to reduce the indebtedness of [Plastics] to your bank. * * *
Plastics' gross sales, sales to Doll, and taxable net income (or loss) before net operating loss deduction and special deductions for the fiscal years ending May 31, 1955, through May 31, 1958, were as follows: Fiscal
year
Sales
Net taxable
ending
Gross sales
to Doll
income
5/31/55
$4,084,743.84
$26,031.50
($227,255.46)
5/31/56
3,758,793.44
51,324.08
(123,154.31)
5/31/57
4,537,815.41
68,756.53
96,929.08
5/31/58
4,152,197.56
20,483.60
32,583.67
On their individual returns for 1958, Harry and Louis each claimed a nonbusiness bad debt deduction in the amount of $68,450 for the worthlessness of claims against Doll. In deficiency notices to Harry and Louis individually, respondent determined that "$68,450.00 claimed * * * as a short-term capital loss arising out of a nonbusiness bad debt is not allowable." Petitioners, upon amending their original petition, claim that respondent "erred in that he did not allow the $68,450 * * * as a 'business' bad debt deductible from ordinary income * * * [and respondent] also erred in *129 that he did not allow as 'business' bad debts in 1958 the amounts of $3,500 and $3,789.06, respectively, claimed by and allowed to petitioners as short-term capital losses in connection with loans to Rico Jewelry Co., and Dual Molding Corporation." In respondent's answer to the amended petition, he makes claim for additional deficiencies as follows: 1957
1958
Harry
$96,935.09
$26,410.42
Louis
22,487.02 In support of these increased deficiencies, respondent alleges: If this Court should find petitioners to be in the business of promoting, managing, investing in, and lending to corporate and other business enterprises for the taxable years 1957 and 1958 then respondent submits that all capital gains and losses should be reported as ordinary income and ordinary losses except for the nonbusiness bad debt of $68,450 reported as a short-term capital loss for the taxable year 1958, which respondent specifically denies petitioners incurred in said year. Issue No. 2 Petitioners' personal tax returns were prepared by the accounting firm of Baker & Baker. The procedure for filing returns had been followed for many years. Additions to tax for delinquency had never previously been determined on returns *130 which had been filed in this manner. On March 19, 1958, Creiger mailed the 1957 returns of both Harry and Louis to Carlson. Carlson then gave the returns to Harry and Louis in order to obtain their wives' signatures. Harry and his wife signed the return on March 24, 1958. About April 1, 1958, Carlson put Harry's signed return in his "follow-up" file. Carlson maintained a "follow-up" file for each day of each month. At the time that Harry's 1957 income tax return was returned to Carlson, a check in partial payment of the tax liability shown thereon was attached to the return and was dated April 15, 1958. On May 12 or May 13, 1958, Carlson discovered the return in his "follow-up" file. Carlson handed the return and attached check to his secretary, Theresa Lemoine, with instructions to forward it by registered mail. Theresa Lemoine put the return and check in an envelope, weighed it, metered it through a Pitney-Bowes machine, and left it on top of the machine, the customary procedure for identifying to the mail pickup man any mail that was to be sent registered from Plastics' office. A person employed by Plastics regularly took registered mail of the corporation to the post office. A *131 slip was usually returned to Plastics showing that the mail to be sent registered was actually mailed. Plastics employed a method whereby registered mail slips returned after mailing were checked against the corporation's retained copy of registered mail slips in order to verify that all registered mail had been sent. This procedure was not followed in the case of Harry's return. On June 27, 1958, the envelope was discovered by office cleaners behind the postage meter machine, where it had apparently fallen after Theresa Lemoine had left it on top of the machine on May 12 or May 13. On June 27, 1958, the return and check were put into a new envelope and forwarded to the Internal Revenue Service, where they were received by June 30, 1958. Harry made no attempt to ascertain whether or not his 1957 income tax return was mailed after he gave it to Carlson. No extensions of time for purposes of filing Harry's 1957 income tax return were requested. Respondent determined an addition to tax under section 6651 for failure to file a timely return for the year 1957, which was offset against a refund resulting from an overpayment of tax in a previous year. In his deficiency notice, respondent *132 determined that "an addition to tax * * * is indicated pursuant to section 6651(a) * * * since you have not established that your failure to file a timely return * * * was due to reasonable cause and not due to wilful neglect." In his amended petition, Harry alleges that respondent "erred in asserting any delinquency penalty for 1957, and further erred in not treating as an overpayment of 1957 tax the sum of $5,977.88 previously assessed and collected as a delinquency penalty in connection with the original filing of petitioners' 1957 income tax return." Harry and Louis had claims against Doll in December 1958 in the amounts of $100,900 and $36,000, which were worthless as of December 31, 1958. Harry and Louis were not in the trade or business of promoting, investing in, organizing, and managing corporations. Harry's failure to file a timely return was due to reasonable cause and not due to willful neglect. Opinion Issue No. 1 Petitioners claim that the debt resulting from the series of advances to Doll was worthless by the end of 1958, and it was originally deducted as a nonbusiness bad debt. [1] Upon amended petition, the position is taken that the debt was incurred in petitioners' *133 trade or business of promoting, organizing, managing, and financing corporations, and therefore is entitled to full deductibility [1] under section 166. A total of $136,900 was advanced to Doll during this period. Petitioners personally advanced $36,000 and caused Plastics *134 to advance the remaining $100,900. Petitioners rely on two related theories to justify their treatment of the loans to Doll as deductible by them. In their own words: "The $100,900 advanced in the first instance by Commonwealth Plastics Corporation [Plastics] to Cosmopolitan Doll and Toy Corporation [Doll] represented a loan made at the risk of petitioners * * * and on their behalf" [2] and "[at] the very least, the petitioners were guarantors of advances made in the first instance by Commonwealth Plastics to Cosmopolitan Doll and Toy Corporation." Respondent regards these as two separate theories [3] *135 and perhaps they are. The record does not entirely clarify the relationship between petitioners and Plastics as to these advances to Doll. As is frequently the situation with closely held corporations, the arrangements were largely informal. Carlson, petitioners' personal secretary, testified that "[Louis] only told me we had to give [Doll] a certain amount of money and I had to take it from where it was most convenient at the particular moment." But, as a practical matter, we are convinced that petitioners were in fact responsible for repaying Plastics' advances to Doll. [4]Daniel Gimbel, 36 B.T.A. 539 (1937); cf. Ralph E. Wilson, 40 T.C. - (Jun. 19, 1963). From the record it is reasonable to infer that the bank's insistence on protecting Plastics' interests was the result of its continuing agreement to furnish a line of credit to Plastics. Of course, Doll's bankruptcy was a substantial factor in the reimbursement of Plastics. But this is no more than to say that if this were a guarantee it would come into operation when the primary debtor defaults. See Putnam v. Commissioner, 352 U.S. 82 (1956); W. F. Taylor Co., 38 B.T.A. 551 (1938). It is evidentiary of petitioners' *136 original and subsisting commitment to indemnify Plastics in order to meet the demands of the bank. Several other facts lead us to this conclusion. A $25,000 advance to Doll in 1956 remained on Plastics' books as an account receivable to Plastics without notation of any guarantee by the Levines after two year-end audits, but petitioners had delivered to the bank various notes owned by them. After the additional advances of $75,900 and in response to criticism by the bank, and in answer to Adams' objections on behalf of the bank, and his accusation of a violation of its agreement, the Levines apparently proposed to Adams at the September meeting that their individual notes would be used to repay Plastics and that the books be appropriately revised to reflect the facts. The adjusting entry, which was made at the conclusion of the annual audit in July or early August, refers to this September *137 meeting, indicating that notation of the arrangement to indemnify Plastics anticipated the bank's reaction in September. And, if this was a guarantee, its informality would not diminish its effectiveness for our purposes. W. F. Taylor Co., supra at 554; Abraham Greenspon, 8 T.C. 431 (1947); see also Hoffman v. Charlestown Five Cents Sav. Bank, 231 Mass. 324, 121 N.E. 15 (1918). A more realistic interpretation of the facts may perhaps be, as primarily contended by petitioners, that the payments made by Plastics to Doll were in fact made on behalf of petitioners, who were the true lenders; and that they were made directly as no more than a short-cut in lieu of first handing the funds to petitioners, who, in turn, would make the advances. While ordinarily such payments might be ambiguous and sometimes be treated as dividends to the stockholders, Harry Makransky, 36 T.C. 446 (1961), affd. - F. 2d - (C.A. 3, Jul. 3, 1963); Irving Sachs, 32 T.C. 815 (1959), affd. 277 F. 2d 879 (C.A. 8, 1960), certiorari denied 364 U.S. 833, such an action here would violate the agreement with the bank as surely as would any direct loan to Doll. Only the existence of solvent debtors would satisfy *138 Plastics' obligation and this could have been the result of a loan to petitioners rather than to Doll. Since, however, the result of such a view of the facts would be the same as a guarantee, see Martin M. Dittmar, 23 T.C. 789 (1955), we express no opinion as to which approach is the more engaging. We are satisfied that it was the intention from the beginning that petitioners would see to it that Plastics suffered no detriment by reason of its loans to Doll. And, in either event, the worthlessness of the debts would make them deductible by petitioners. In addition, of course, the Levines are entitled to consider the $36,000 personally advanced by them as debts to them from Doll. Respondent's objection to a deduction as a nonbusiness bad debt is that these debts have not been shown to have become worthless in 1958. There can be little doubt that the $36,000 due petitioners and the $100,900 nominally owed Plastics were uncollectible as of December 31, 1958. Doll could not meet the second of the six installments which had to be paid before Plastics or petitioners had any chance of receiving any payment. And the court-appointed auditor, Oscar Gang, testified that "the creditors * * * *139 who had subordinated their claims * * * didn't have a chance to get any money out of the situation." Certainly, the fact that Doll nominally continued in business until November 1959 could not reasonably alter the probability that the subordinated creditors would receive nothing. J. Chr. G. Hupfel Co., Inc., 9 B.T.A. 944, 954 (1927); see also William Purvin, 6 T.C. 21 (1946). In addition to arguing that the debts were not worthless in December 1958, respondent contends that petitioners have not proved that the debts had any value as of the beginning of 1958. Doll's tax returns answer this argument. It is stipulated that income reported for the fiscal years in question was as follows: 3/31/56
$ 15,258.91
3/31/57
4,016.12
3/31/58
Loss
(382,347.45)
3/31/59
Loss
(457,496.36) On Doll's tax return for the fiscal year ending March 31, 1958, cash, accounts receivable, and inventories exceeded $580,000, the fixed assets had a book value in excess of $150,000, even though the liabilities, including the $350,000 due West Indies and petitioners exceeded $1,000,000. As of that date, March 31, 1958, we are not persuaded that as a practical matter there was then a reasonable probability that no assets *140 of [Doll] would be available for unsecured creditors. We are convinced [petitioners'] loans had some intrinsic, potential value on that date. W. A. Dallmeyer, 14 T.C. 1282, 1294 (1950). We have, therefore, found as a fact that petitioners suffered a loss from the worthlessness of a debt during 1958. Fred A. Bihlmaier, 17 T.C. 620 (1951). Petitioners argue that this debt was created and the loss incurred in petitioners' trade or business of promoting, organizing, managing, and financing corporations. The Supreme Court in Whipple v. Commissioner, 373 U.S. 193 (1963), rehearing denied 374 U.S. 858 (1963), has recentl y provided a conclusive answer to this contention. In finding that such activity, with certain limited exceptions, could never constitute a trade or business, the Court declared (pp. 201-204): * * * [In 1942] Congress broadened § 23(a) to reach income producing activities not amounting to a trade or business and conversely narrowed § 23(k) to exclude bad debts arising from these same sources. The 1942 amendment of § 23(k), therefore, as the Court has already noted, Putnam v. Commissioner, 352 U.S. 82, 90-92, was intended to accomplish far more than to deny full deductibility *141 to the worthless debts of family and friends. It was designed to make full deductibility of a bad debt turn upon its proximate connection with activities which the tax laws recognized as a trade or business, a concept which falls far short of reaching every income or profit-making activity. * * *
Devoting one's time and energies to the affairs of a corporation is not of itself, and without more, a trade or business of the person so engaged. Though such activities may produce income, profit or gain in the form of dividends or enhancement in the value of an investment, this return is distinctive to the process of investing and is generated by the successful operation of the corporation's business as distinguished from the trade or business of the taxpayer himself. When the only return is that of an investor, the taxpayer has not satisfied his burden of demonstrating that he is engaged in a trade or business since investing is not a trade or business and the return to the taxpayer, though substantially the product of his services, legally arises not from his own trade or business but from that of the corporation. Even if the taxpayer demonstrates an independent trade or business of his *142 own, care must be taken to distinguish bad debts losses arising from his own business and those actually arising from activities peculiar to an investor concerned with, and participating in, the conduct of the corporate business. If full-time service to one corporation does not alone amount to a trade or business, which it does not, it is difficult to understand how the same service to many corporations would suffice. To be sure, the presence of more than one corporation might lend support to a finding that the taxpayer was engaged in a regular course of promoting corporations for a fee or commission, see Ballantine, Corporations (rev. ed. 1946), 102, or for a profit on their sale, see Giblin v. Commissioner, 227 F. 2d 692 (C.A. 5th Cir.), but in such cases there is compensation other than the normal investor's return, income received directly for his own services rather than indirectly though the corporate enterprise and the principles of Burnet, Dalton, du Pont and Higgins are therefore not offended. On the other hand, since the Tax Court found, and the petitioner does not dispute, that there was no intention here of developing the corporations as going businesses for sale to customers *143 in the ordinary course, the case before us inexorably rests upon the claim that one who actively engages in serving his own corporations for the purpose of creating future income through those enterprises is in a trade or business. That argument is untenable in light of Burnet, Dalton, du Pont and Higgins, and we reject it. [10] Absent substantial additional evidence, [11]furnishing management and other services to corporations for a reward no different than that flowing to an investor in those corporations is not a trade or business under § 23(k)(4). Petitioners have not argued or proved that *144 they were in the business of "promoting corporations for a fee or commission" or "for a profit on their sale." In fact, they expressly renounce the latter concept. Nor could petitioners argue that they were protecting or maintaining a trade or business of working as corporate executives for Doll. See Eugene H. Rietzke, 40 T.C. 443 (1963). Apparently they received no salary from that corporation. Finally, the two cases not apparently disapproved by the Supreme Court, Maloney v. Spencer, 172 F. 2d 638 (C.A. 9, 1949), and J. T. Dorminey, 26 T.C. 940 (1956), are not applicable since petitioners were not renting property to Doll nor securing a source of supply for their personal business. We have hence found as a fact that petitioners are not in the trade or business of promoting corporations for any of the limited purposes listed in the Whipple case, and the losses resulting from the bad debts of Doll, in addition to those of Rico Jewelry Co. and Dual Molding Corp., must be considered nonbusiness bad debts within the meaning of section 166(d). Respondent's alternative argument advanced by amended answer and resulting in a claim for increased deficiency need be given but scant notice. *145 The foundation for it has been rejected by our conclusion that petitioners were not in the trade or business of promoters and did not hold their various corporate and other ventures for sale to customers in the ordinary course of their trade or business. See Thomas Reed Vreeland, 31 T.C. 78 (1958); Whipple v. Commissioner, supra at p. 202. We conceive respondent's claim to be an alternative only in the event the debts were granted business bad debt treatment. Respondent having succeeded on the primary issue, the alternative becomes moot. Issue No. 2 Respondent assessed an addition to tax [5] for Harry's failure to file until June 27, 1958 his 1957 return which was due on April 15. The parties are in apparent agreement as to the facts and there is no contention that the delay was due to willful neglect. The question is whether the inadvertent errors causing the delay constitute reasonable cause for failure to file. The regulations provide *146 that "[if] the taxpayer exercised ordinary business care and prudence and was nevertheless unable to file the return within the prescribed time, then the delay is due to a reasonable cause." Section 301.6651-1(a)(3), Proced. & Admin. Regs. Harry's reliance upon a procedure which had resulted in the successful filing of his and other returns for many years, and upon the people who in the past had performed efficiently and effectively was reasonable enough. See Herbert Marshall, 41 B.T.A. 1064 (1940). Purely inadvertent administrative oversights such as misfiling, Bouvelt Realty, Inc., 46 B.T.A. 45 (1942), have constituted reasonable cause. Carnie-Goudie Manufacturing Co., 18 B.T.A. 893 (1930); Hammonton Investment and Mortgage Co. v. Commissioner, 284 F. 2d 950 (C.A. 3, 1960), affirming per curiam a Memorandum Opinion of this Court. * * * [Such] return was made out in time, but due to the oversight of some employee was not at once filed and * * * as soon as the oversight was discovered it was corrected. * * * [Petitioner] has a good reputation for meeting its tax bills and * * * the failure to file * * * was a mere oversight * * *. [Carnie-Goudie Manufacturing Co., supra at p. 900.] *147 * * * We are not unmindful of the grave necessity for the timely filing of tax returns, but the imposition of the penalty is not made mandatory by the statute. Congress was fully alive to the fact that there would be cases where responsible officers of corporations had taken every safeguard for filing their returns and yet something went wrong. We are of the opinion that on these facts the penalty should not be imposed. [Bouvelt Realty, Inc., supra at p. 48.] As a result, we conclude that Harry exercised ordinary care and prudence and that the addition to tax was not justified. Decision will be entered under Rule 50. Footnotes
*. A—Harry and Louis directly.
B—Commonwealth Plastics, Inc.
C—Baker Industires, Inc.
D—Harry and Louis through Mike Rubin.↩
1. SEC. 166 [I.R.C. 1954]. BAD DEBTS. (a) General Rule. - (1) Wholly worthless debts. - There shall be allowed as a deduction any debt which becomes worthless within the taxable year. * * *
(d) Nonbusiness Debts. - (1) General rule. - In the case of a taxpayer other than a corporation - (A) subsections (a) and (c) shall not apply to any nonbusiness debt; and (B) where any nonbusiness debt becomes worthless within the taxable year, the loss resulting therefrom shall be considered a loss from the sale or exchange, during the taxable year, of a capital asset held for not more than 6 months. (2) Nonbusiness debt defined. - For purposes of paragraph (1), the term "nonbusiness debt" means a debt other than - (A) a debt created or acquired (as the case may be) in connection with a trade or business of the taxpayer; or (B) a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business. * * *↩
2. Respondent phrases their contention in his brief as follows: "Petitioners claim that it was always the understanding that if the advances [became] worthless that the Commonwealth [Plastics] Corporation [Plastics] would be indemnified by them since the advances were made on behalf of the Levines and, therefore, the advances were as if the [petitioners] actually advanced the funds." [Italics added.] ↩
3. "Respondent agrees that if either of the two theories noted by petitioners were accepted by the Court any loss related to Cosmopolitan [Doll] would be the Levines." [Italics added.] Respondent's reply brief.
4. The record, for example, fully supports the statement that "Harry Levine testified to his understanding that the $100,900 advanced in the first instance by Commonwealth Plastics Corporation to Cosmopolitan was money advanced at his risk and that of his brother, Louis, as individuals." Petitioners' brief.↩
10. To the extent that they hold or contain, statements to the contrary, we disapprove of such cases as Maytag v. United States, Ct. Cl. , 289 F. 2d 647; Mays v. Commissioner, 272 F. 2d 788 (C.A. 6th Cir.); Commissioner v. Stokes' Estate, 200 F. 2d 637 (C.A. 3d Cir.); Foss v. Commissioner, 75 F. 2d 326 (C.A. 1st Cir.); Washburn v. Commissioner, 51 F. 2d 949 (C.A. 8th Cir.); Sage v. Commissioner, 15 T.C. 299; Campbell v. Commissioner, 11 T.C. 510; and Cluett v. Commissioner, 8 T.C. 1178↩. 11. Compare Maloney v. Spencer, 172 F. 2d 638 (C.A. 9th Cir.), and Dorminey v. Commissioner, 26 T.C. 940↩.
5. Section 6651(a), I.R.C. 1954↩, provides for an addition to tax "[in] case of failure to file any return * * * on the date prescribed therefor * * *, unless it is shown that such failure is due to reasonable cause and not due to willful neglect * * *."