T.C. Memo. 2015-202

UNITED STATES TAX COURT

JOSE ESPAILLAT AND MIRIAN LIZARDO, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 19095-12.                    Filed October 15, 2015.

<u>Marcy E. Golomb</u>, for petitioners.

<u>Michael W. Lloyd</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

BUCH, <u>Judge</u>:  Respondent issued notices of deficiency determining the

following deficiencies and penalties with respect to Mr. Espaillat and Ms.

Lizardo's Federal income tax for the 2008 and 2009 taxable years:[1]

---

[1]All section references are to the Internal Revenue Code as in effect for the
tax years in issue.  All Rule references are to the Tax Court Rules of Practice and
(continued...)

|   [*2]   |            | Penalty     |
|   Year   | Deficiency | sec. 6662(a) |
|----------|------------|-------------|
| 2008     | $56,254    | $11,251     |
| 2009     | 4,164      | 833         |

Additionally, respondent allowed Mr. Espaillat and Ms. Lizardo a $3,000 capital loss deduction for 2009.  Most of the adjustments relate to a $359,000 loss deduction claimed with respect to taxable year 2008 on a Schedule C, Profit or Loss From Business, for Rocky Scrap Metal, Inc. (Rocky Scrap Metal), a scrap metal business owned and operated by Mr. Espaillat's brother, Leoncio Espaillat (Leoncio).  Among other adjustments, respondent disallowed that loss deduction and determined accuracy-related penalties under section 6662(a) and (b)(1) and (2).

After concessions, the primary issues for decision are whether the $359,000 loss deduction should be disallowed for 2008 and whether Mr. Espaillat and Ms. Lizardo are liable for accuracy-related penalties under section 6662(a) and (b)(1) and (2).  On the basis of the evidence presented at trial, we sustain respondent's disallowance of the loss deduction; however, Mr. Espaillat and Ms. Lizardo are

_____

[1](...continued)
Procedure.  All monetary amounts are rounded to the nearest dollar.

**[*3]** not liable for accuracy-related penalties.  At trial respondent moved to amend the pleadings to conform to the evidence to disallow the $3,000 capital loss deduction for 2009.  We will grant respondent's motion.

## FINDINGS OF FACT

Since 1998 Mr. Espaillat has owned a successful landscaping business aptly named Dusty Landscaping, LLC, in Phoenix, Arizona, where he resides with his wife, Ms. Lizardo.

During the years in issue Mr. Espaillat was also involved with Rocky Scrap Metal.  Ms. Lizardo was a homemaker, but she also assisted with keeping records and helping with Rocky Scrap Metal as needed.

On each of their joint Federal income tax returns for 2008 and 2009, Mr. Espaillat and Ms. Lizardo included a Schedule C for Dusty Landscaping and also a second Schedule C.  The Dusty Landscaping Schedule C for 2008 reflects a successful landscaping and maintenance business that earned $209,355.  The second Schedule C for 2008 relates to a business named "Jose Espaillat", which is characterized as a "second hand metal dealer" and for which Mr. Espaillat and Ms. Lizardo claimed a $359,000 loss deduction for 2008.  The loss is reported as "Other expenses" on line 27 of the Schedule C.  All other lines on the "Jose Espaillat" Schedule C are blank.  This loss deduction more than offset the

[*4] $209,355 in revenue from Dusty Landscaping. For 2009 Dusty Landscaping earned $37,957 and the "Jose Espaillat" Schedule C business reported gross receipts of $18,775 and zero expenses, resulting in a net profit of $18,775.

I.    Rocky Scrap Metal

In 2006 Leoncio started Rocky Scrap Metal. The articles of incorporation for Rocky Scrap Metal were filed with the secretary of state of Texas on September 25, 2006. Rocky Scrap Metal is a C corporation in the metal recycling or "scrap metal" industry. Rocky Scrap Metal filed Forms 1120, U.S. Corporation Income Tax Return, for 2007, 2008, and 2009. Each return reports that "L. Espaillat" owns 100% of the common corporate stock. No other shareholders are listed. Mr. Espaillat has not asserted that he received any stock when Rocky Scrap Metal was founded in 2006.

Leoncio enlisted Mr. Espaillat to assist him in running the business and to provide startup funds.

From 2006 to 2013 Mr. Espaillat assisted Leoncio with Rocky Scrap Metal, traveling to Texas regularly. Mr. Espaillat repaired property owned by Rocky Scrap Metal and also assisted with financial management and overall operations. Mr. Espaillat's involvement with the business was based on an oral agreement. As time progressed Mr. Espaillat became more involved in Rocky Scrap Metal,

[*5] eventually traveling to Texas monthly and staying a week or more. In 2008 Mr. Espaillat purchased a home in Texas where he stayed during his frequent trips. While in Texas, he ran Dusty Landscaping remotely with the help of his business manager.

Mr. Espaillat helped fund Rocky Scrap Metal. Because Leoncio needed working capital and his bank was charging a high rate of interest, Mr. Espaillat agreed to provide seed money. Mr. Espaillat provided the money to Leoncio but did not charge interest; he simply asked to be paid back. He provided cash to fund the business, and he also made direct purchases for Rocky Scrap Metal. During 2007 and 2008 Mr. Espaillat and Ms. Lizardo (and Dusty Landscaping) contributed at least $285,000 to Leoncio and Rocky Scrap Metal. Mr. Espaillat's support of Rocky Scrap Metal also continued in 2009, during which he paid Rocky Scrap Metal's bankruptcy attorney.

Because Mr. Espaillat could not always be in Texas, he enlisted his son, Eduan, to work at Rocky Scrap Metal. Eduan worked at Rocky Scrap Metal from August 2007 to July 2008 and again from fall 2011 to July 2012. Eduan assisted with sorting through the scrap metal and preparing bids on behalf of Rocky Scrap Metal. If a bid was successful, he was responsible for delivering the cash to the seller. He also assisted with sales and finances because Leoncio did not have

[*6] expertise in these areas. While working at Rocky Scrap Metal, Eduan observed Leoncio's business practices and questionable financial skills.

Rocky Scrap Metal operated at least until 2013. In 2009 it filed for bankruptcy protection. Rocky Scrap Metal issued Mr. Espaillat a Form 1099-MISC, Miscellaneous Income, for 2010 reporting income of $72,000 and a Form 1099-MISC for 2011 reporting income of $58,000. In 2013 it was the subject of litigation over its ownership.

## II.   Bankruptcy

The scrap metal market collapsed in 2008, and Rocky Scrap Metal's business suffered. Rocky Scrap Metal claimed a net operating loss deduction for 2008.

Rocky Scrap Metal filed a petition for bankruptcy in 2009. Leoncio retained bankruptcy counsel who was paid by Mr. Espaillat, and Leoncio signed the bankruptcy petition on behalf of Rocky Scrap Metal as its president. Mr. Espaillat was unfamiliar with bankruptcy, but he signed the bankruptcy plan at Leoncio's behest. That plan listed Mr. Espaillat as a creditor. An amended Schedule F, Creditors Holding Unsecured Nonpriority Claims, filed on June 3, 2010, in the bankruptcy of Rocky Scrap Metal, listed Mr. Espaillat as having an unsecured priority claim of $285,000 for "Money Loaned".

**[*7]**   The bankruptcy plan provided that all unsecured general creditors would receive 100% of the amounts owed to them.  The creditors voted to approve the plan on September 15, 2010; Mr. Espaillat voted in favor of the plan.  On September 16, 2010, the bankruptcy court confirmed the plan.  The bankruptcy court entered a final decree on March 10, 2011.  Mr. Espaillat received a check for $6,000 as a result of the bankruptcy plan.

III.   Mr. Espaillat's Ownership of Rocky Scrap Metal

On October 28, 2010, Mr. Espaillat entered into a stock purchase agreement with Leoncio for ownership of Rocky Scrap Metal.  The agreement provided that Mr. Espaillat would receive 50% of the company in exchange for the $285,000 he had previously extended plus $50,000 in cash.  The agreement states:  "Seller will sell, transfer, and deliver to Buyer and Buyer will purchase, at the closing date, * * * 50% of the outstanding issued stock of the Corporation."

In 2011 because of the management problems at Rocky Scrap Metal and Mr. Espaillat's need to work at Dusty Landscaping, Eduan and Ms. Lizardo moved to Texas to work daily at Rocky Scrap Metal.  Mr. Espaillat believed that he was a co-owner of Rocky Scrap Metal, which is why his family moved to Texas to help with the business operations.

**[*8]** IV.    Rocky Scrap Metal Litigation

Eventually the relationship between Mr. Espaillat and Leoncio deteriorated. While this case has been pending, a lawsuit was also pending regarding control of Rocky Scrap Metal.[2]  On June 13, 2013, a judge entered a temporary restraining order barring Mr. Espaillat, Ms. Lizardo, and Eduan from managing or controlling the business bank accounts, records, or the business operations of Rocky Scrap Metal.  Mr. Espaillat's, Ms. Lizardo's, and Eduan's involvement in Rocky Scrap Metal ended in June 2013.

V.    Tax Return and Audit

Mr. Espaillat and Ms. Lizardo kept the business records for Dusty Landscaping and their other financial affairs.  For many years they employed Timothy Golomb, a certified public accountant (C.P.A.) with over 30 years of experience to prepare their returns.  He prepared their jointly filed 2008 and 2009 tax returns.

Before filing their returns, Mr. Espaillat and Ms. Lizardo filled out a questionnaire that Mr. Golomb used, and they supplied complete and accurate information for all of the relevant issues.  Before preparing the returns, Mr.

---

[2]Rocky Scrap Metal, Inc. v. Espaillat, No. 2013-25865 (Dist. Ct. Harris Cty., Tex., 189th Jud. Dist.).

**[*9]** Golomb discussed with Mr. Espaillat and Ms. Lizardo the transfers they made to Rocky Scrap Metal and the other expenditures they made on its behalf. After these discussions Mr. Golomb recommended that a Schedule C was "the best place to put it." They followed his advice and took this position when reporting their expenses associated with Rocky Scrap Metal on their 2008 return.

On May 7, 2012, the Internal Revenue Service (IRS) issued a notice of deficiency to Mr. Espaillat and Ms. Lizardo concerning their 2008 and 2009 returns. The notice of deficiency made adjustments to the Schedules C filed with those returns. In particular, it disallowed the claimed $359,000 "other expenses" deduction on the 2008 return. Additionally for 2008, the IRS disallowed a $16,070 deduction for repairs and maintenance, a $9,430 deduction for mortgage interest, and $10,108 in itemized deductions. The IRS increased gross receipts and sales by $13,537 and decreased costs of goods sold by $8,485. In sum, the IRS made an adjustment of $369,907 for 2008 for a total corrected tax liability of $37,181 (not including self-employment tax). Mr. Espaillat and Ms. Lizardo's 2009 income tax return included a Schedule C for a scrap metal business with $18,775 of gross receipts and zero expenses. For 2009 the IRS again disallowed deductions for repairs and maintenance of $14,059 and mortgage interest of $15,414. The IRS determined a $285,000 short-term loss for 2009 relating to the

[*10] bankruptcy of Rocky Scrap Metal, of which $3,000 was allowed as a capital loss deduction for 2009. Throughout the audit proceedings Mr. Espaillat and Ms. Lizardo took the position that the funds were a loan to Leoncio.

On July 30, 2012, while residing in Arizona, Mr. Espaillat and Ms. Lizardo timely filed a petition with the Court. The petition states that "[t]he entire amount of the deficiency and addition to tax is in dispute." Mr. Espaillat and Ms. Lizardo take particular issue with the disallowance of the $359,000 loss deduction for 2008. They assert that the loss is an ordinary and necessary business expense related to a business called "Second Hand Metal" although at trial they took the position that this amount should have been $285,000. The testimony and evidence related mainly to the expenditures of and transfers to Rocky Scrap Metal; the only allusion to any other scrap metal business was during the parties' opening statements and when they were specifically discussing how items were reported for tax purposes.

Respondent initially contended that Mr. Espaillat's funds were capital investments and thus the loss was a capital loss. At the conclusion of trial respondent moved to amend the pleadings to conform to the evidence, seeking to deny the $3,000 capital loss deduction that had been allowed in the notice of deficiency for 2009.

**[\*11]** After trial Mr. Espaillat and Ms. Lizardo failed to address any of the other Schedule C issues in their opening brief or their reply brief. Respondent detailed these issues in his opening brief.

VI.     Motion To Conform the Pleadings to the Evidence

At trial respondent moved to conform the pleadings to the evidence. Specifically, respondent asserted that the allowance of a $3,000 capital loss deduction in the notice of deficiency was unsupported by the evidence at trial and was contrary to Mr. Espaillat and Ms. Lizardo's trial position that their contribution to a scrap metal business entitled them to a Schedule C loss deduction.

Respondent now argues that Rocky Scrap Metal is an ongoing C corporation and that after 2009 Mr. Espaillat and Ms. Lizardo received things of significant value (e.g., money evidenced by Forms 1099-MISC and stock evidenced by the stock purchase agreement) from Rocky Scrap Metal. Moreover, by filing tax returns after 2009 and by being involved in ongoing 2013 litigation concerning who controlled it, Rocky Scrap Metal indicated that it was continuing to operate. Thus, respondent argues that the evidence is inconsistent with his treatment of Mr. Espaillat and Ms. Lizardo as creditors on the notice of deficiency

**[*12]** and that it is also inconsistent with a determination that a bad debt deduction is proper for 2009.

## OPINION

The issues we must decide are whether Mr. Espaillat and Ms. Lizardo's claimed 2008 Schedule C loss deduction for the "Jose Espaillat" scrap metal business should be adjusted and whether they are liable for accuracy-related penalties under section 6662(a) and (b)(1) and (2). Additionally, we must decide whether to grant respondent's motion to amend the pleadings to conform to the evidence regarding the $3,000 capital loss deduction for 2009. Other issues raised in the notice of deficiency and not addressed in the stipulations or at trial are deemed conceded.[3]

---

[3]We deem Mr. Espaillat and Ms. Lizardo to have abandoned or conceded adjustments made to their 2008 and 2009 Schedules C relating to Dusty Landscaping, adjustments to their 2008 and 2009 self-employment tax, adjustments to their 2008 and 2009 itemized deductions, and the adjustment to their 2009 education credit because they did not raise these issues at trial or on brief. See Nicklaus v. Commissioner, 117 T.C. 117, 120 n.4 (2001); Rybak v. Commissioner, 91 T.C. 524, 566 n.19 (1988).

**[*13]** I.     Burden of Proof

Taxpayers generally bear the burden of proof when contesting the determinations set forth in a notice of deficiency.[4]  If taxpayers introduce "credible evidence with respect to any factual issue", the burden of proof on that issue will shift to the Commissioner if certain conditions are met.[5]  However, if the Commissioner raises a new issue or seeks an increase in the deficiency, the Commissioner bears the burden of proof as to the new issue or the increased deficiency.[6]  Taxpayers bear the burden of proving the amounts of any claimed deductions.[7]  Mr. Espaillat and Ms. Lizardo do not argue that the burden should shift, and they have not met the requirements under section 7491(a) for shifting the burden.  Accordingly, the burden remains on them except for the issue of their entitlement to the capital loss deduction for 2009, which respondent raised at trial.

---

[4]See Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933).

[5]Sec. 7491(a)(1).

[6]See Rule 142(a)(1).

[7]INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992); sec. 1.6001-1(a), Income Tax Regs.

[*14] The Commissioner bears the burden of production with respect to any penalty or addition to tax.[8] Taxpayers then bear the burden of proving any defenses.[9]

II.    Procedural Issue

Generally, we deem issues raised and tried by the consent of the parties to have been raised in the pleadings.[10] In appropriate circumstances, an issue that was not expressly pleaded but was tried by express or implied consent of the parties may be treated as if raised in the pleadings.[11] Whether a motion to conform the pleadings should be allowed, however, is within the discretion of the Court.[12] If the opposing party is unfairly surprised or prejudiced, then the motion should be denied.[13]

---

[8]Sec. 7491(c).

[9]See Higbee v. Commissioner, 116 T.C. 438, 447 (2001).

[10]Rule 41(b).

[11]Rule 41(b)(1); LeFever v. Commissioner, 103 T.C. 525, 538-539 (1994), aff'd, 100 F.3d 778 (10th Cir. 1996).

[12]Commissioner v. Estate of Long, 304 F.2d 136, 144 (9th Cir. 1962).

[13]Estate of Horvath v. Commissioner, 59 T.C. 551, 555 (1973); see also Krist v. Commissioner, T.C. Memo. 2001-140; McGee v. Commissioner, T.C. Memo. 2000-308.

[*15] After a review of the entire record, we find that the factual issues giving rise to respondent's motion were raised during trial with the parties' consent. The evidence on which respondent bases his motion was admitted at trial by way of the stipulation of facts. We do not find that granting respondent's motion would unfairly surprise or prejudice Mr. Espaillat and Ms. Lizardo. Accordingly, we will grant respondent's motion to conform the pleadings to the evidence and to assert an increased deficiency.

III. Business Expense or Loss Deduction

Mr. Espaillat and Ms. Lizardo offer a muddled series of arguments that they are entitled to deduct a loss from a scrap metal business. At times they seem to argue that Mr. Espaillat made neither a loan nor an investment, but the record is clear that he did not operate his own scrap metal business; he provided funds to Leoncio and Rocky Scrap Metal. To the extent they argue that Mr. Espaillat invested in Rocky Scrap Metal, they failed to prove that the investment became worthless at any time during the years in issue. And at times they seem to argue that Mr. Espaillat lent money to Leoncio and to Rocky Scrap Metal, but they failed to establish worthlessness of any such loans. They argue that Mr. Espaillat and Leoncio were in a de facto partnership, but the record is clear that Rocky Scrap

**[\*16]** Metal was an operating C corporation.  In short, none of these muddled theories are supported by either the law or the facts.

### A.    Business Expense Deduction

Deductions are a matter of "legislative grace", and "a taxpayer seeking a deduction must be able to point to an applicable statute and show that he comes within its terms."[14]  As a general rule, section 162(a) authorizes a deduction for "all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business".  An expense is ordinary for purposes of this section if it is normal or customary within a particular trade, business, or industry.[15]  An expense is necessary if it is appropriate and helpful for the development of the business.[16]  Implicit in the foregoing definitions is the concept that a taxpayer must in fact be "carrying on" a trade or business for expenditures to be deductible under section 162.

Mr. Espaillat and Ms. Lizardo claimed a deduction of $359,000 as "other expenses" on their 2008 return.  Although they introduced business

---

[14]See Rule 142(a); New Colonial Ice Co. v. Helvering, 292 U.S. 435, 440 (1934).

[15]Deputy v. du Pont, 308 U.S. 488, 495 (1940).

[16]Commissioner v. Heininger, 320 U.S. 467, 471 (1943).

[*17] records into evidence, none of the evidence supports deductions for an independent "Jose Espaillat" scrap metal business.

There was no such business. The evidence solely related to the operations of, funds provided to, and family dynamics concerning Rocky Scrap Metal, and as a result Mr. Espaillat and Ms. Lizardo failed to meet their burden of proving entitlement to deductions for expenses from a separate scrap metal business. The record establishes that the only scrap metal business was that of Rocky Scrap Metal. And it is well established that officers, employees, or shareholders may not deduct the payment of corporate expenses on their individual returns.[17] "Such payments constitute either capital contributions or loans to the corporation and are deductible, if at all, only by the corporation."[18]

B.    Individual Loss Deduction

In their briefs Mr. Espaillat and Ms. Lizardo argue they are entitled to an ordinary loss deduction under section 165. Section 165(a) permits a deduction for uncompensated losses during a given tax year. As relevant to the present case,

---

[17]Craft v. Commissioner, T.C. Memo. 2005-197 (citing Deputy v. du Pont, 308 U.S. at 494, Noland v. Commissioner, 269 F.2d 108 (4th Cir. 1959), aff'g T.C. Memo. 1958-60, and Rink v. Commissioner, 51 T.C. 746, 751 (1969)).

[18]Gantner v. Commissioner, 91 T.C. 713, 725 (1988) (citing Deputy v. du Pont, 308 U.S. at 494, and Rink v. Commissioner, 51 T.C. at 751).

[*18] section 165(c) limits the deduction for an individual taxpayer to losses either incurred in a trade or business or resulting from a transaction entered into for profit.

The evidence supports three plausible theories as to why Mr. Espaillat and Ms. Lizardo might be entitled to a loss deduction. The first theory is that they are entitled to a loss deduction from a Schedule C scrap metal business. Mr. Espaillat and Ms. Lizardo argue that they are engaged in an independent trade or business because of their involvement with Rocky Scrap Metal. However, as already discussed, a taxpayer that devotes time and energy to the affairs of a corporation is not engaged in his or her own trade or business but instead is furthering the business of the corporation.[19] Such a taxpayer is not permitted to deduct losses attributable to a corporation on his or her Schedule C because they belong to the corporation.[20] Accordingly, Mr. Espaillat and Ms. Lizardo are not permitted a loss deduction under section 165(c)(1).

---

[19]Whipple v. Commissioner, 373 U.S. 193, 202 (1963).

[20]Moline Props., Inc. v. Commissioner, 319 U.S. 436, 439 (1943); Charfoos v. Commissioner, T.C. Memo. 1991-292.

[*19] This leads us to the remaining theories: a worthless securities deduction for a loss on their investment in Rocky Scrap Metal or a bad debt deduction for losses on the loans to Rocky Scrap Metal. We take those in turn.

C.      Worthless Securities

Mr. Espaillat and Ms. Lizardo testified that they received an interest in Rocky Scrap Metal for the transfers to Leoncio and Rocky Scrap Metal. If this were the case, Mr. Espaillat and Ms. Lizardo would be entitled to a worthless securities deduction under section 165(g) upon showing that their securities became worthless. To show worthlessness, a taxpayer must demonstrate a "fixed and identifiable event" demonstrating worthlessness.[21] A deduction for a loss from worthless securities is allowed only for the year that the loss is sustained.[22]

Mr. Espaillat and Ms. Lizardo failed to demonstrate worthlessness for either 2008 or 2009. Mr. Espaillat testified to the scrap metal industry's crashing in 2008, decreasing the value of Rocky Scrap Metal. However, we have previously held that a mere decline in the value of stock does not indicate worthlessness when

[21]Dittman v. Commissioner, 23 T.C. 789, 798 (1955); Dewey v. Commissioner, T.C. Memo. 1993-645.

[22]Austin Co. v. Commissioner, 71 T.C. 955, 969 (1979).

[*20] the stock still has recognizable value.[23]  Therefore, without more, the stock did not become worthless in 2008.

It also did not become worthless in 2009.  Rocky Scrap Metal filed for bankruptcy in 2009; however, it continued to operate.  The continuation of a business after a taxpayer claims a worthless securities deduction indicates that the deduction was premature.[24]  After 2009 Mr. Espaillat received stock and nonemployee compensation from Rocky Scrap Metal; those facts indicate continuing operations.  Moreover, continuing operations are further indicated by a lawsuit over Rocky Scrap Metal's control that was commenced in 2013.  Thus, if the funds Mr. Espaillat provided to Rocky Scrap Metal were contributions relating to an ownership interest, that interest did not become worthless in 2009 because Rocky Scrap Metal continued to operate at least into 2013.

Mr. Espaillat and Ms. Lizardo are not entitled to a worthless securities loss deduction under section 165(g)(1) for 2008 or 2009.

---

[23]Goran v. Commissioner, T.C. Memo. 1995-100; sec. 1.165-4(a), Income Tax Regs.

[24]Goran v. Commissioner, T.C. Memo. 1995-100.

**[*21]** D.  <u>Bad Debt Deduction</u>

The other plausible theory is that Mr. Espaillat and Ms. Lizardo are entitled to a bad debt deduction under section 166.  Much of the evidence supports the notion that Mr. Espaillat's transfers to Rocky Scrap Metal or Leoncio were loans.  Nonetheless, even a bona fide loan to Rocky Scrap Metal would not entitle Mr. Espaillat and Ms. Lizardo to a deduction.

Section 166 allows taxpayers to deduct any debt that becomes worthless within the taxable year.[25]  To be entitled to a deduction, the taxpayer must show a bona fide debt based on a debtor-creditor relationship.[26]

Business debts and nonbusiness debts are treated differently under section 166.[27]  Nonbusiness debts are defined as debts other than "(A) a debt created or acquired (as the case may be) in connection with a trade or business of the taxpayer; or (B) a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business."[28]  Whether a debt is a business or nonbusiness debt

---

[25]Sec. 166(a)(1).

[26]Sec. 1.166-1(c), Income Tax Regs.

[27]<u>Cooper v. Commissioner</u>, 143 T.C. 194, 216 (2014).

[28]Sec. 166(d)(2).

[*22] is a question of fact,[29] and for a business debt taxpayers "must show that the bad debt loss is 'proximately related' to the conduct of trade or business, or that the debt was created in the course of trade or business."[30] Taxpayers must treat nonbusiness bad debts as losses from the sale or exchange of a short-term capital asset and can deduct the debt only for the year that the debt becomes wholly worthless.[31] However, business bad debts give rise to ordinary deductions that can be offset against ordinary income.[32] Under section 1212(b), a noncorporate taxpayer is required to offset capital losses against capital gains for a particular taxable year. If aggregate capital losses exceed aggregate capital gains for a taxable year, up to $3,000 of the excess may be deducted against ordinary income.[33]

---

[29]Rollins v. Commissioner, 276 F.2d 368, 371 (4th Cir. 1960), aff'g 32 T.C. 604 (1959); sec. 1.166-5(b)(2), Income Tax Regs.

[30]Litwin v. United States, 983 F.2d 997, 999 (10th Cir. 1993).

[31]Secs. 166(d)(1)(B), 1211(b), 1212(b); sec. 1.166-5(a)(2), Income Tax Regs.

[32]Sec. 166(a).

[33]Sec. 1211(b).

**[\*23]** As an initial matter, Mr. Espaillat and Ms. Lizardo do not argue and the record does not support that they are in the business of lending. Accordingly, we must focus on the rules for nonbusiness bad debts.

In order to deduct a nonbusiness bad debt, a taxpayer must show that the loan became wholly worthless.[34] Section 166 allows only wholly worthless nonbusiness debts to be deducted, and in order for a debt to be wholly worthless its "last vestige of value" must be gone.[35] Taxpayers "must show sufficient objective facts from which worthlessness could be concluded; mere belief of worthlessness is not sufficient."[36] If a debtor files a bankruptcy petition, the bankruptcy can be an indication that at least part of an unsecured debt is worthless; however, "[i]n bankruptcy cases a debt may become worthless before settlement in some instances; and in others, only when a settlement in bankruptcy has been reached."[37]

---

[34]Dustin v. Commissioner, 53 T.C. 491, 501 (1969), aff'd, 467 F.2d 47 (9th Cir. 1972); sec. 1.166-5(a)(2), Income Tax Regs.

[35]Bodzy v. Commissioner, 321 F.2d 331, 335 (5th Cir. 1963), aff'g in part, rev'g in part T.C. Memo. 1962-40.

[36]Fincher v. Commissioner, 105 T.C. 126, 138 (1995).

[37]Sec. 1.166-2(c), Income Tax Regs.

[*24] The Court's determination of worthlessness is based on a facts and circumstances test, and the taxpayer must show "identifiable events that form the basis of reasonable grounds for abandoning any hope of recovery."[38] The taxpayer's determination that the debt became wholly worthless "must be made in the exercise of sound business judgment, based upon as complete information as is reasonably obtainable."[39] A taxpayer's subjective opinion of worthlessness, standing alone, is not enough.[40]

Mr. Espaillat and Ms. Lizardo initially took the position that the $285,000 contribution to Rocky Scrap Metal constituted a loan to Leoncio although they treated Leoncio and Rocky Scrap Metal as interchangeable. Mr. Espaillat and Ms. Lizardo presented documentation of Rocky Scrap Metal's 2009 bankruptcy filing to show worthlessness. In making the determination to allow a deduction for 2009, respondent assumed that Rocky Scrap Metal was defunct and that the purported loan was worthless as a result of the 2009 bankruptcy. Accordingly,

---

[38]Aston v. Commissioner, 109 T.C. 400, 415 (1997); see also Fincher v. Commissioner, 105 T.C. at 137-138; Dallmeyer v. Commissioner, 14 T.C. 1282, 1291-1292 (1950).

[39]Andrew v. Commissioner, 54 T.C. 239, 248 (1970).

[40]Fox v. Commissioner, 50 T.C. 813, 822 (1968) ("Mere belief that a debt is bad is insufficient to support a deduction for worthlessness[.]").

[*25] respondent credited Mr. Espaillat and Ms. Lizardo with a $3,000 capital loss deduction for 2009 on the theory that it was bad debt. But the record indicates that Rocky Scrap Metal was an operating business after the 2009 bankruptcy--Mr. Espaillat and Ms. Lizardo received income from Rocky Scrap Metal in 2010 and 2011. Furthermore, a lawsuit over its control commenced in 2013.

Regardless of whether the funds constituted a loan, the debt was not worthless in 2009 because Rocky Scrap Metal continued to be an operating entity. Accordingly, a bad debt deduction is not allowed because the loan did not become worthless at that time.

### E.    De Facto Partnership

Mr. Espaillat and Ms. Lizardo argue that the deductions were allowable because Rocky Scrap Metal was not a corporation but instead was a de facto partnership. This argument is without merit; the record is clear that Rocky Scrap Metal was a corporation. Rocky Scrap Metal conducted a legitimate, even if not always profitable, scrap metal business with a physical location in Texas. Rocky Scrap Metal was incorporated in 2006 with the secretary of state of Texas and filed Forms 1120 for 2007, 2008, and 2009.

Under Moline Props., Inc., we do not disregard a corporation for Federal tax purposes if it served an intended business function or purpose or engaged in

[*26] business.[41]  The degree of corporate business purpose or the quantum of business activity required for recognition of the separate existence of a corporation is rather minimal.[42]  Rocky Scrap Metal easily overcomes this hurdle.  We will not disregard its form.

IV.    Penalties

Section 6662(a) and (b)(1) and (2) imposes a 20% accuracy-related penalty on any portion of an underpayment of tax required to be shown on a return if the underpayment is due to, among other reasons, negligence, disregard of rules or regulations, or any substantial understatement of income tax.  An understatement of income tax is "substantial" if the understatement exceeds the greater of 10% of the tax required to be shown on the return or $5,000.[43]  Respondent asserts these penalties in the alternative.

---

[41]Moline Props., Inc. v. Commissioner, 319 U.S. at 438-439.

[42]Hosp. Corp. of Am. v. Commissioner, 81 T.C. 520, 579-580 (1983); Strong v. Commissioner, 66 T.C. 12, 24 (1976), aff'd without published opinion, 553 F.2d 94 (2d Cir. 1977); Nat Harrison Assocs., Inc. v. Commissioner, 42 T.C. 601, 618 (1964).

[43]Sec. 6662(d).

[*27] These penalties do not apply to any portion of an underpayment for which a taxpayer establishes that he had reasonable cause and acted in good faith.[44] The Court must consider all facts and circumstances in determining whether the taxpayer acted with reasonable cause and in good faith.[45] To establish good-faith reliance on an adviser, the taxpayer must prove that (i) the taxpayer gave the return preparer complete and accurate information, (ii) an incorrect return was the preparer's fault, and (iii) the taxpayer believed in good faith that he was relying on a competent return preparer's advice as to the tax treatment.[46]

Mr. Espaillat and Ms. Lizardo run a landscaping business in Arizona. Although the landscaping business is successful, Mr. Espaillat's expertise is in running a labor-intensive company. He is familiar with running a business and keeping records but has limited knowledge of the tax code. In sum, Mr. Espaillat is an experienced small business owner but not a sophisticated taxpayer.

---

[44]Sec. 6664(c)(1).

[45]Higbee v. Commissioner, 116 T.C. at 448; sec. 1.6664-4(b)(1), Income Tax Regs.

[46]Estate of Goldman v. Commissioner, 112 T.C. 317, 324 (1999) (citing Metra Chem Corp. v. Commissioner, 88 T.C. 654, 662 (1987)), aff'd without published opinion sub nom. Schutter v. Commissioner, 242 F.3d 390 (10th Cir. 2000).

[*28] For the years in issue Mr. Espaillat and Ms. Lizardo enlisted Mr. Golomb, their C.P.A. of over a decade, to prepare their returns. Mr. Golomb had Mr. Espaillat and Ms. Lizardo each fill out a questionnaire before preparing their return for each year. He testified that Mr. Espaillat and Ms. Lizardo provided all the requisite information and were otherwise thorough in completing the questionnaires. Mr. Golomb credibly testified that he held a conversation discussing the facts of the situation with Mr. Espaillat and Ms. Lizardo about the different places to report their loss on the returns and that he thought a Schedule C was "the best place to put it."

While the facts at hand do not lend themselves to such a position, Mr. Espaillat and Ms. Lizardo relied on Mr. Golomb in good faith. Mr. Espaillat and Ms. Lizardo have retained Mr. Golomb for at least 10 years without incident. Mr. Golomb is a C.P.A. with over 30 years of experience. Moreover, because Mr. Espaillat and Ms. Lizardo had always used a Schedule C in relation to Dusty Landscaping, they had every reason to believe that a Schedule C was the appropriate place to report their financial dealings with Rocky Scrap Metal. While Mr. Espaillat and Ms. Lizardo's trust in Mr. Golomb was misplaced, they believed in good faith that he was accurately and correctly preparing their returns.

**[*29]** In sum, Mr. Espaillat and Ms. Lizardo provided sufficient evidence and testimony that they acted with reasonable cause and in good faith within the meaning of section 6664(c) in relying on their C.P.A. with respect to the disallowed deductions. Accordingly, they are not liable for accuracy-related penalties for 2008 and 2009.

V.    Conclusion

Mr. Espaillat and Ms. Lizardo have failed to meet their burden of proving that they are entitled to all or part of their claimed loss deductions for 2008 or 2009. We do not need to reach the question of whether the funds Mr. Espaillat provided to Leoncio or Rocky Scrap Metal were loans or contributions to capital because each of these alternatives would result in the disallowance of the claimed Schedule C loss deductions for the years before us. Respondent's motion to conform the pleadings to the evidence for 2009 will be granted, and the capital loss deduction for 2009 will be disallowed. Mr. Espaillat and Ms. Lizardo are not liable for accuracy-related penalties for 2008 and 2009.

To reflect the foregoing,

An appropriate order and decision
will be entered under Rule 155.